## THE STATE v. ALBERT LITTLE, Appellant.

### Division Two, May 26, 1910.

1. **MURDER: Begun by Indictment: Continued by Information: Plea in Abatement: No Exceptions.** A plea in abatement to the information setting up that an indictment had previously been presented charging the defendant with the same murder, and was then pending, is waived, if at the term it is overruled defendant fails to save any exceptions. The plea should either have been renewed at a subsequent term, or at the term at which it was overruled he should have saved his exceptions and preserved them and the evidence in support thereof by a term bill of exceptions.

2. **PLEA IN ABATEMENT: Preserved for Appeal.** Exceptions to the court's action in overruling a plea in abatement can be preserved for review only in the bill of exceptions. They form no part of the record proper, and if preserved therein alone cannot be considered on appeal.

3. **INSTRUCTION: Armed for Self-Protection: No Evidence.** It is error to tell the jury that deceased "had a right to arm himself, with the honest purpose to protect his own life, or to defend himself against any other attack by defendant," where there is no evidence to support those suppositions. So where

228 Sup—18

defendant had assaulted deceased with his fists, and deceased went away to another saloon and procured a pistol and went to the saloon where defendant was, remarking as he went in to two witnesses, that he was going in there to kill defendant, it was error to include those words in the State's instruction, for he did not go where defendant was in the pursuit of protection. An instruction may be correct in the abstract, but erroneous in view of the evidence.

4. ———: Conspiracy. Where the case is barren of any evidence that deceased and his companions, either before or after the homicide, were acting in concert for the accomplishment of a common unlawful design, but if, on the other hand, it plainly shows that defendant was acting independently, no instruction telling the jury that, if the evidence establishes a conspiracy between defendant and his companions to whip deceased, or take his life, or do him some great bodily harm, they might take into consideration every act and declaration of each member of the conspiracy in pursuance of the original concerted plan; but, on the contrary, the instruction should tell the jury that there was no evidence of conspiracy where the State has undertaken to establish one and failed to do so.

5. EVIDENCE: Hearsay: Conspiracy: Res Gestae. A statement made by one witness to another, sometime prior to the difficulty and out of the presence of both defendant and deceased, that defendant "had it in for" deceased, is not admissible in evidence, is no part of the *res gestae*, and does not tend to establish a conspiracy.

6. INSTRUCTION: Self-Defense: Borrowing Pistol to Kill: No Evidence. Where defendant met deceased in a saloon and beat him with his fists, and after they had separated and defendant had apparently withdrawn from the difficulty they later met and, both having pistols and both shooting, deceased was killed, an instruction telling the jury that if defendant had made up his mind to whip deceased and borrowed a pistol for the purpose and with the intention of killing deceased, if in his judgment it should be necessary for him to kill him in order to accomplish said design, and in pursuance to said purpose defendant provoked and entered into a difficulty with deceased and assaulted him, then there is no self-defense in the case, is erroneous—there being no evidence whatever that defendant knew deceased was in town when he borrowed the pistol, and he testified he borrowed it because he had been told other persons were likely to injure him.

7. ———: ———: Acting Under Violent Passion. An instruction which tells the jury that if deceased, at the time of the

State v. Little.

combat, was acting under .a violent passion aroused by a previous assault upon him, then defendant, by reason of his having originally been in the wrong, could not avail himself of the plea of self-defense, is erroneous. It in effect tells the jury that defendant's right to self-defense depended upon deceased's state of mind. Defendant's guilt is in no wise dependent upon whether deceased was in a cool state of mind or otherwise.

8. ———: ———: **Withdrawing from Conflict.** Where defendant withdrew from the conflict in good faith, intending to abandon it, his right of self-defense revived, notwithstanding he began the first combat with a murderous design.

9. **CONVICTION OF MURDER: Correct Instruction on Manslaughter.** Notwithstanding defendant was tried and convicted of murder in the second degree, yet if the evidence warranted an instruction on manslaughter in the fourth degree and the court gave an instruction on that subject, defendant was entitled to a correct one, and has a right to complain of an erroneous one.

10. **INSTRUCTION: Self-Defense: Acts Due to Passion of Deceased.** An instruction for the State on self-defense in the ordinary form, to which was added the words: "But if the jury believe and find from the evidence that the acts and conduct of the deceased, which produced in the mind of the defendant, as a reasonable man, the fear of such apprehended danger to his life or limb, were the result of a violent passion aroused in the mind of deceased, either by an assault made upon the deceased by the defendant because the deceased called the defendant a son-of-a-bitch, or by an assault made upon the deceased by the defendant in a difficulty which the defendant provoked or brought on with the deceased, and that said passion had not had time to cool, and had not cooled, you cannot acquit the defendant on the ground of self-defense, but must convict him of either murder in the second degree or manslaughter in the fourth degree," is erroneous—the evidence showing that the two difficulties were separate and distinct. ·

11. ———: ———: **Abandoning Difficulty.** Although defendant may have brought on the first difficulty and assaulted deceased, yet if he clearly abandoned it and deceased went away and some minutes later returned and was the aggressor in the difficulty which resulted in his death, the question of provoking the difficulty should be limited to the last difficulty, and a correct instruction defining defendant's right to self-defense as if such former difficulty had not occurred should be given.

12. ———: ———: ———: **Request for Correct Instruction.** And there being evidence that defendant had abandoned the difficulty

which he brought on, and that deceased was the aggressor in the latter fatal difficulty, an instruction presenting his right to self-defense on that theory, though itself faulty, amounted to a request for a correct instruction on the subject.

Appeal from Pemiscot Circuit Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED..

*Ward & Collins* and *Rice A. Pierce* for appellant.

(1) The information in this case is insufficient. (a) It fails to charge with what the assault was made. State v. Ferguson, 152 Mo. 92; 2 Hawk. P. C., ch. 22, sec. 60. (b) It fails to charge that the mortal wound was feloniously given. State v. Green, 111 Mo. 585; State v. Williams, 184 Mo. 261; State v. Woodward, 191 Mo. 617. (2) Defendant's plea in abatement should have been sustained. R. S. 1899, sec. 2476; Laws 1901, p. 138. This plea in abatement in proper form, duly sworn to, was presented to the court, and all the facts therein alleged were fully established and not denied, yet the court overruled said plea, and defendant saved his exceptions. (3) The court erred in admitting incompetent, irrelevant and immaterial testimony offered by the State, over defendant's objections and exceptions. There was absolutely not a word nor a circumstance indicating a conspiracy formed between McElvain, Little or any other person. No evidence that McElvain knew that there had ever existed (if there ever had) any difficulty between Little and Langdon. No evidence or circumstance of a formed design, plan or confederation between Little and McElvain, or any of the other parties in this crowd, to say or do anything whatever to Ed Langdon. "A defendant cannot be bound by statements and acts of third parties made out of his presence." State v. Newcomb, 220 Mo. 63; State v. Jaeger, 66 Mo. 180; State v. Rothchild, 68 Mo. 52; State v. Richard, 194 Mo. 326; State v.

Patrick, 107 Mo. 147; State v. Woodward, 191 Mo. 617. A conspiracy was neither charged nor proved, yet the court permitted a great number of witnesses to detail what divers persons said, as well as the conduct and appearance of such divers persons, not in the presence nor hearing of the defendant, when defendant knew nothing of the statements, acts, and conduct of such other persons. State v. Roberts, 201 Mo. 727; State v. Daubert, 42 Mo. 239; State v. Walker, 98 Mo. 95; State v. Duncan, 64 Mo. 262; State v. Ross, 29 Mo. 32; State v. Boatright, 182 Mo. 33. The instructions given by the court were erroneous. (4) Instruction "A" is not the law for the following reasons: (a) because it was the submission to the jury of a matter not in issue in the case, deceased not being on trial and there being no evidence that he went and armed himself with the honest purpose of protecting himself against a further attack by defendant. "Instruction in criminal cases must be predicated on the facts brought out at the trial; for instructions not supported by evidence should not be given." State v. Hargraves, 188 Mo. 337; State v. Harris, 59 Mo. 550; State v. Brown, 63 Mo. 439; State v. Turlington, 102 Mo. 642; Estes v. Shoe Co., 155 Mo. 577; State v. Lewis, 118 Mo. 79. (b) This instruction in effect told the jury that deceased had a right to go and get a pistol, and thereby placed upon defendant the wrongdoing of deceased. (c) And said instruction, ending with this phrase, that deceased had a right "to defend himself against a further attack by defendant," assumes that deceased had been attacked by defendant in the first altercation. Who attacked was disputed, so this instruction assumes as a fact questions for the jury. (5) Instruction "B" was altogether unwarranted, there being no evidence of a conspiracy in this case. The court in said instruction fails to tell the jury what facts constitute conspiracy, or to define in any way the word "conspiracy," and for that reason the instruction is erroneous. State v. Da-

vies, 80 Mo. App. 239. Instruction "C" is erroneous for the following reasons: 1. Because there is no evidence whatever upon which to base it. State v. Walker, 196 Mo. 73; State v. Packwood, 26 Mo. 340; State v. Chambers, 87 Mo. 406; State v. Smith, 125 Mo. 2; State v. Elsey, 201 Mo. 561. No witness gave any testimony to indicate, nor were there any circumstances in evidence to indicate (a) that "defendant had made up his mind to whip Ed Langdon, and (b) that he borrowed a revolver from Jerry McElvain for the purpose and with the intention of killing said Langdon; . . . And (c) in pursuance to said said purpose and intention, defendant provoked and entered into a difficulty with said Langdon." 2. Said instruction fails wholly to take into consideration the time that elapsed between the fist fight and the killing; it fails to make the qualifications that a party who enters into a difficulty may abandon it, and if the other party still pursues him, his right of self-defense still remains. State v. Partlow, 90 Mo. 627; State v. Webb, 216 Mo. 388; 1 Bishop (5 Ed.), sec. 871; State v. Stultz, 97 Mo. 26; State v. Heath, 221 Mo. 589; State v. Gordon, 191 Mo. 124; Brouster v. Fox, 117 Mo. App. 728; State v. Sebastian, 215 Mo. 84. (6) Instruction "D" is erroneous for the following reasons: 1. There is no evidence whatever upon which said instruction could be based, namely, "that (a) defendant made up his mind to whip Ed Langdon; that (b) he borrowed a revolver for the purpose and with the intention of killing Langdon;" and (c) "in pursuance of said purpose, defendant provoked a difficulty with Langdon." 2. Said instruction omits altogether the qualifications as to whether, after the fist fight alluded to in this instruction, the defendant abandoned same, "in the space of repentance that there always is open, where a combatant in good faith, may abandon the conflict." See cases, supra. 3. Said instruction makes defendant's right of self-defense, after the fist fight was over and

had been abandoned by both parties, depend entirely
upon whether or not Ed Langdon's passion, if any, oc-
casioned by said fist fight, had cooled. 4. It took de-
fendant's right of self-defense away from him, even
though the fist fight had been by him honestly aban-
doned, and even though Ed Langdon, after the fist
fight, procured a revolver and first attempted to shoot,
or did shoot, the defendant, and although defendant
was forced to shoot Langdon in order to save his own
life. 5. This instruction permitted the jury to convict
the defendant, even though he was attacked by Langdon
with a pistol and actually shot at, provided Langdon
had not cooled off from the fist fight. 6. It permitted
Langdon, because he and Little had had a fist fight, to
go out and arm himself with a pistol and voluntarily
return and shoot Little; and Little must either stand
and be shot down or go to the penitentiary. 7. It
switches the questions of cooling time, violent passion,
etc., from the defendant to the deceased; and takes
from the defendant the mitigation afforded him by the
law, when he kills a man in a violent passion, before his
blood has cooled. 8. The question of "passion and
cooling time" is a question of mitigating circum-
stances, lowering the crime from murder to manslaugh-
ter—always a question for the defendant and not a
question as to the deceased. 21 Am. and Eng. Ency.
Law (2 Ed.), pp. 174-177; R. S. 1899, sec. 1833; State
v. Ellis, 74 Mo. 207; State v. Robertson, 178 Mo. 496.
(7) Instruction "E" is open to all the criticisms, ob-
jections and errors of the one above. It switches the
question of cooling time and violent passion from the
defendant to the deceased and cuts out defendant's
right of self-defense. Here the combat had ended, and
Little had asked Langdon to come have a drink and
make up and be friends; and he had, "in the space of
repentance, in good faith, withdrawn and abandoned
the conflict, and his right of self-defense thereupon re-
vived; and this would have been true notwithstanding

he began the combat with a felonious and murderous
design." State v. Lockett, 168 Mo. 489; State v. Sebas-
tian, 215 Mo. 58; State v. Cable, 117 Mo. 485; State v.
Patterson, 159 Mo. 560; State v. Heath, 221 Mo. 587.
The uncontradicted evidence shows in this case that
D. P. Huffman had threatened defendant's life, which
threat had been communicated to defendant, and that
defendant was in town on the very night of this killing,
and that long before defendant even knew that Lang-
don was with his brother-in-law, Pillow, the defendant,
in order to defend himself against the anticipated
danger of the execution of Huffman's threats, bor-
rowed a pistol. At the time he borrowed the pistol,
he had not had a cross word with Langdon and there
was no expected trouble between them, and there is no
evidence to show that the defendant anticipated meet-
ing Langdon; yet the State was attempting to make
great capital out of the fact that the defendant had bor-
rowed a pistol, and undertaking to make it appear
(without any testimony to substantiate it) that the de-
fendant was anticipating trouble with Langdon. The
right to carry this pistol under such circumstances was
guaranteed to the defendant by the statutes of this
State; and since it was so guaranteed, the defendant
was entitled to an instruction to that effect. R. S. 1899,
sec. 1836; State v. Venable, 117 Mo. App. 501. (8) The
court erred in refusing defendant's instruction 11.
This instruction simply guarantees to the defendant
the right of self-defense, notwithstanding the fist fight,
provided the jury found "that defendant and deceased
voluntarily abandoned said difficulty," and that there-
after the deceased went out and armed himself and
came back and renewed the difficulty. This is in ac-
cordance with the well-settled law in this State. State
v. Patterson, 159 Mo. 560; State v. Cable, 117 Mo. 385;
State v. Partlow, 90 Mo. 627; State v. Lockett, 168 Mo.
480; State v. Gordon, 191 Mo. 124; State v. Heath, 221
Mo. 588; State v. Sebastian, 215 Mo. 84. If, however,

that instruction was erroneous in any verbiage, or omits some fact necessary to complete a legal instruction, yet if it is sufficient to call the court's attention to defendant's theory, the court is required under the law to correct the error and give an instruction on that theory.   State v. Adler, 146 Mo. 18.

*Elliott W. Major,* Attorney-General, and *Chas. G. Revelle,* Assistant Attorney-General, for the State.

(1)   We fail to appreciate the force of appellant's first assignment, which is to the effect that the information does not charge with what the assault was made, or that the mortal wound was feloniously given.   These facts are specifically alleged, and every essential element necessary to constitute the crime of murder in the first degree is charged in accordance with forms heretofore approved by this court.   State v. Heath, 221 Mo. 570; State v. Barrington, 198 Mo. 36; State v. Privet, 175 Mo. 223; State v. Kindred, 148 Mo. 270; State v. Richardson, 194 Mo. 329.   The cases cited by appellant afford no basis for the attack made on this information.   (2)   This court is precluded from considering appellant's second assignment, which is that his plea in abatement should have been sustained.   No term bill of exceptions was filed and no leave taken to file same thereafter.   Not only was no term bill filed, but the bill of exceptions proper does not embody the plea in abatement, the evidence, if any, offered in support thereof, nor any exception to the action of the court in overruling same.   R. S. 1899, sec. 2562; State v. Clark, 186 Mo. 293; State v. Hicks, 160 Mo. 468; State v. Wilhoit, 142 Mo. 619; State v. Finley, 193 Mo. 210; State v. Reed, 154 Mo. 126; State v. Penland, 199 Mo. 154.   (3)   There is evidence of an understanding and conspiracy between these parties, and the admission of the evidence complained of, and the instructions given on the question, were fully warranted.   Such conduct as these parties were guilty of on the evening in question

does not characterize the actions of innocent men, and is inconsistent with any reasonable theory, except that these parties were acting together in the accomplishment of a common and unlawful design. It is well established that a conspiracy, like any other fact, may be established by circumstantial evidence, and it is not essential that it be proven by express agreement between the conspirators, or by direct evidence of any agreement. State v. Kennedy, 177 Mo. 166. In this case the trial court, whose duty it was in the first place to say whether there was any evidence of a conspiracy, has found that there is such evidence. Under such circumstances he properly submitted the question to the jury, and this court will not interfere. State v. Walker, 98 Mo. 103; State v. Roberts, 201 Mo. 728; State v. Kennedy, 177 Mo. 130; State v. Spaugh, 200 Mo. 591; State v. Darling, 199 Mo. 201; State v. Vaughn, 200 Mo. 20. For the purpose of the submission of this question to the jury the attempted explanation of this criminatory conduct in no manner weakens the force of such conduct, or otherwise affects the case. To the jury alone belongs the function of determining the crucial question of fact, whether the explanation offered and the denials made were true. The explanation offered seems flimsy. It is indeed remarkable that these persons found it necessary to arm themselves with three deadly weapons in order to induce a brother-in-law, who was intoxicated, to return to his home. For one whose sole mission is to take an intoxicated person home and prevent further drinking on his part, it is somewhat peculiar that he endeavors to induce such party to take further drinks, as was done in this case. It is also remarkable that such Samaritans should make no effort to accomplish their declared mission, and should forget the one purpose of their search, and allow the intoxicated brother-in-law to leave them in the place in which they found him, and wander off to another saloon, and then for them to remain where he

left them for five or ten minutes, and later renew their search with pistols in their hands. It further seems somewhat out of harmony with their declared mission for them to assault, maliciously and without the slightest provocation, another person who had endeavored to take this drunken brother-in-law home, and who had succeeded in inducing him to start in that direction. It seems especially peculiar that, before they made any further effort to accomplish their declared mission and take this party home, they singled out one person, assaulted him, and, later, killed him. Upon such facts it is reasonable to conclude that the jury did not hesitate long in finding that these parties were acting together in the accomplishment of one common design. (4) Criticism of instruction "A" is based upon the following grounds: 1. Because there is no evidence tending to show that the deceased went and armed himself with the honest purpose of protecting himself against a further attack by defendant. 2. That said instruction assumes that deceased had been attacked by defendant in the first altercation, which was a disputed fact. Relative to the first criticism, it is sufficient to say that substantially all the evidence is to the effect that about five minutes before the tragedy occurred, and before deceased armed himself, he was wantonly and maliciously assaulted by the defendant, who did not thereafter voluntarily abandon the use of violence toward the deceased, but continued same until defendant forcibly made his escape, the defendant even striking and kicking him as he left, and threatening at the time to force the deceased to return and obey his commands. Under these conditions, defendant left deceased and armed himself, returned to the premises and entered the cigar department, the defendant being then in the barroom. According to the State's evidence, the deceased made no hostile demonstrations and said nothing of a provoking nature to defendant after arming himself, but, on the

contrary, appealed to the defendant to desist from further attacking him or having further trouble. This certainly is evidence that the deceased had been assaulted, and soon thereafter armed himself with the honest purpose of protecting himself from further assault. Under the circumstances he was warranted in securing arms. Subsequent events demonstrate the soundness of his judgment in this respect and the necessity of such action. The next objection to this instruction is wholly without merit. The instruction does not assume that deceased had been attacked by defendant, but, quite the reverse, it expressly requires the jury to find that he had been assaulted by defendant before the instruction could apply or the jury be governed by it. State v. Dunn, 221 Mo. 544. (5) The complaint made of instruction "B," which relates to the acts of conspirators, is but a rehash of the objection lodged against the admission in evidence of statements made by the parties involved. The instruction itself is free from prejudicial error, and the evidence upon which it was predicated was sufficient. (6). Instruction "C" is challenged upon two grounds, namely, that there is no evidence upon which to base it, and that it fails to take into consideration the time that elapsed between the first fight and the killing, and further fails to recognize the doctrine of repentance and the abandonment of a voluntary difficulty. Concerning the first ground of complaint, it seems pertinent to say that it is bottomed upon the same theory as is appellant's statement of the facts developed during the trial. This theory seems to be that in some unusual manner, and by some phenomenal method, which is not disclosed, all the State's evidence, and a large portion of the defendant's, must be completely ignored, and the appeal determined upon the testimony alone of the defendant and a few of his choice witnesses. The disclosures of the record make it clear that a short time before the first difficulty, the defendant borrowed a revolver from

McElvain and soon thereafter assaulted the deceased
without the slightest provocation, but in order to grat-
ify a harbored malice engendered by some prior con-
duct on the part of the deceased. While the first
assault was being made, defendant stated that he was
"whipping the deceased because he had whipped his
brother and had kicked him (defendant) off the train."
He further said, "I have been owing him that for some
time." The State's evidence further discloses that
immediately upon the return of the deceased, the de-
fendant was again the aggressor, again assaulted the
deceased without the slightest provocation, first strik-
ing him with his fist, then with his pistol, and finally
shooting him when he offered resistance. If a person
is to be judged by his conduct, and is presumed to in-
tend the inevitable consequences of his own acts, this
defendant was guilty of murder, and the conclusion
that there was no evidence upon which to base this
instruction can result only from a distortion, or rather
a destruction, of the facts. The second criticism of
this instruction is equally untenable. Counsel say they
assume that the instruction alludes to the first or the
"fist" fight. This assumption is unwarranted. The
instruction has reference to the whole of defendant's
conduct directly connected with the killing and de-
tailed by the State's and some of the defendant's wit-
nesses. According to that testimony, defendant not
only provoked the first difficulty and punished the de-
ceased until he fled, but he was also the aggressor in
the fight of fatal finish and killed the deceased when he
offered resistance to defendant's further efforts to
do him bodily harm. Upon such facts there was no re-
pentance, no space for repentance, and no abandon-
ment of the difficulty provoked, but, on the contrary,
defendant was actively carrying out the purpose of the
malicious attack, and did not abandon or repent until
his victim was mortally wounded. This instruction de-
clares the law of this State as it has been since, and

even prior to, its announcement in the Partlow Case. State v. Feeley, 194 Mo. 322; State v. Partlow, 90 Mo. 614; State v. Dunn, 221 Mo. 542; State v. Darling, 202 Mo. 171; State v. Gordon, 191 Mo. 127; State v. Bailey, 190 Mo. 286; State v. Robertson, 178 Mo. 502; State v. Maupin, 196 Mo. 172.    (7)    It is unnecessary to note appellant's assignment that instruction "D" was not based upon any evidence, since such a conclusion would necessarily eliminate the testimony of the defendant himself and his chief witnesses, who testified that within a few minutes after defendant made the first assault, as heretofore stated, the deceased returned to the cigar department of the saloon, called the defendant to him, and at once began shooting. It is said of this instruction that it excludes from consideration the question of abandonment of the conflict in the "space always open for repentance," that it shifts the question of cooling time and violent passion from the defendant to the deceased, and makes defendant's right of self-defense depend upon whether the passion aroused in deceased by the first assault had in fact subsided. With reference to the last contention, it is sufficient to say that the right is not made dependent upon the question whether the passion aroused in deceased had in fact subsided, but upon the double proposition that it had not in fact subsided, and had not had reasonable time in which to subside. While this instruction is not of the ordinary form, it correctly declares the law. Whenever a party by his own wrongful and malicious acts excites in another a violent passion, and voluntarily produces a condition of affairs wherein the assaulted and impassioned person acts in such a manner that the wrongdoer's own safety requires him to take the life or do bodily harm, the law wisely imputes to the aggressor the natural consequences of his own wrong and will not permit him to escape such consequences on the plea of self-defense. The doctrine of imperfect self-defense necessarily recognizes, in fact is predi-

cated upon, this principle.  This doctrine recognizes that although a person bring on a difficulty with no felonious intent, intending only an ordinary battery, a mere whipping of the person assaulted, he cannot invoke the plea of self-defense, but is guilty of manslaughter, regardless of the extremity to which he is reduced, if he provokes the combat and death results. State v. Darling, 202 Mo. 173; State v. Gordon, 191 Mo. 128; State v. Kelleher, 201 Mo. 630; State v. Gilmore, 95 Mo. 554; State v. Rose, 92 Mo. 207; State v. Partlow, 90 Mo. 616.  As long as the action of the assaulted person is the consequence of the passion wrongfully aroused by the aggressor, it is wholly immaterial whether the action followed instantaneously. or later, provided it followed before such passion has had reasonable time to cool.  State v. Bowles, 146 Mo. 15.  (8)  Defendant cannot complain of any alleged error in the instructions relating to fourth degree manslaughter, since he was tried and convicted on the charge of second degree murder.  State v. Dunn, 80 Mo. 681; State v. Talbot, 73 Mo. 358; State v. Smith, 80 Mo. 519; State v. Jackson, 169 Mo. 297.  (9) Defendant's instruction 11 is faulty in form and is not warranted by the facts or the law governing the case. The theories of the parties, in so far as the evidence supported them, were covered by the instructions given, and this instruction had no place in this case.

FOX, J.—On the 14th day of September, 1908, the prosecuting attorney of Pemiscot county filed in the circuit court of said county an information charging the defendant with murder in the first degree. Thereafter, upon the defendant's application, the regular judge of the circuit court was disqualified, and Honorable J. L. Fort, judge of the Twenty-second Judicial Circuit, was selected to try the case.  Thereafter the State waived the charge of murder in the first degree, and elected to try the defendant on the charge

of murder in the second degree. Upon trial had, the
defendant was found guilty of murder in the second
degree, the jury assessing his punishment at ten years
in the penitentiary. Timely motions for new trial and
in arrest of judgment were filed and overruled. Judg-
ment was entered in accordance with the verdict, from
which judgment defendant prosecutes his appeal to
this court.

The testimony on the part of the State tends to
prove that at about 7:30 or 8 o'clock on the evening of
March 2, 1908, the deceased, Edward Langdon, in com-
pany with Clay Pillow, Elmer Sanders and Ed Mode,
was in a saloon, known as the Opera saloon in the town
of Caruthersville, Pemiscot county, Missouri, and that
said Clay Pillow, who was intoxicated, was giving
expression to an unfriendly feeling towards one Jerry
McElvain, not then present. Soon thereafter McEl-
vain, one Vaughn, and the defendant entered the sa-
loon. McElvain stepped to the bar, borrowed two
dollars from the bartender, and invited those present
to join him in a drink. The defendant did not go to the
bar, but stood near the wall, opposite from the bar,
and behind the deceased. Some of the invited persons,
including Clay Pillow, accepted McElvain's invitation
to drink with him, whereupon Sanders and the de-
ceased, having observed the intoxicated condition of
Pillow, a brother-in-law of the defendant, persuaded
him to leave the saloon and start towards home. The
deceased, Sanders and Pillow left the saloon, and when
they reached the Depot saloon, which was owned by
Sanders, Pillow stated that he wanted one more drink,
and would go home after getting it, whereupon they
entered the Depot saloon. They had been there about
ten minutes when the defendant, McElvain and Vaughn
entered the saloon together, and the testimony is that
when these three left the Opera saloon McElvain ex-
posed a pistol and carried it in his hand. Upon enter-
ing the Depot saloon, McElvain went to the bar and

invited those present to have another drink with him.
The deceased was then standing at the bar, and just as
the other invited persons stepped to the bar for the
purpose of taking a drink, the defendant, without any
apparent provocation, assaulted the deceased, striking,
beating and kicking him. The deceased made no hostile
demonstration whatsoever, but when attacked by the
defendant he said, "What is the matter—what do you
mean?" To which the defendant replied: "You know
what I am whipping you for; you whipped my brother
when he could not help himself, and you kicked me off
the train." The defendant then cursed and abused
the deceased, and continued to beat him upon the head
and face, the deceased endeavoring to ward off the
blows. Finally the deceased released himself and left
the saloon, saying, "If this is the kind of treatment I
get I will leave," the defendant replying, "I think you
will get out." As Langdon (the deceased) was going
out the door, either the defendant or McElvain said,
"We will make him come back and take a drink." Lit-
tle then called to him, but the deceased did not come.
Soon after the deceased left the saloon, the defendant
said: "I have been owing him that for some time. He
kicked me off the train when he was conductor, and
he also whipped my dead brother when he couldn't
help himself." While the defendant was assaulting
Langdon, McElvain and Pillow stepped back from the
bar and drew their pistols, Pillow saying to McElvain,
"I think you are handy with your gun." The witness
who testified to this fact said he supposed that Pillow
thought that McElvain wanted to engage in a difficulty
with him, Pillow having previously expressed ill-will
towards McElvain.

After leaving the Depot saloon, Langdon went to
Barnett's saloon, a short distance away, opened a
drawer in that saloon and took therefrom a pistol be-
longing to the bartender, and which Langdon carried

away against the expressed wish of the bartender. The pistol or revolver was a Smith & Wesson of a 32 or 38 caliber, and having five chambers loaded. Langdon examined the pistol to see if it was loaded, and again examined it while crossing the railroad track between the two saloons, and then returned to the Depot saloon. He stopped in the cigar department, which was separated from the barroom by swinging screen doors in which were glass panels, one of which was broken, and rested his arms on the cigar case. Witness Sanders saw him come in, having observed him through the broken glass panel in the screen, and he remarked to the defendant, "There he is now." The defendant immediately went out to the cigar department, and, advancing upon the deceased, said, "Here you are back; you haven't had enough." He then struck the deceased with his hand, and immediately thereafter drew a large Colt's revolver from his pocket and struck the deceased therewith on the head. The deceased was heard to say, "Albert, let's not have any trouble; I have done nothing to you, and have nothing against you." There was a struggle between the two men, and both fired several shots, each receiving two bullet wounds. The deceased was shot through the abdomen, and was also wounded in the jaw and neck; the latter wound, according to the testimony, indicating that it was made by a smaller bullet than that which passed through the abdomen. The defendant's wounds were in the neck and leg. Both men were taken to a hospital, where the deceased died next day from the effect of the bullet wound in the abdomen. The testimony is conflicting as to who fired the first shot, but two witnesses to the encounter, who testified for the State, stated that the defendant was the aggressor and fired the first shot; that they saw the defendant strike the deceased with his pistol, and then place the weapon against the side or stomach of the

deceased and discharge it, after which the deceased fired his pistol, and the defendant fell.

On the part of the defendant, the testimony tends to prove that between 6:30 and 7:30 o'clock, on the evening of March 2, 1908, the defendant, McElvain and Vaughn were at McElvain's saloon, and while there defendant borrowed a large pistol of McElvain. Thereafter, McElvain, Vaughn and the defendant went to the Opera saloon in search of defendant's brother-in-law, Clay Pillow, who was intoxicated, the defendant having previously been requested by Pillow's wife to take him home. Upon their arrival at said saloon they there found said Pillow, in company with Sanders, the deceased, and others. As to what occurred at the Opera saloon, the testimony is similar to that on the part of the State as above detailed. About five minutes after Pillow, Sanders and the deceased left said saloon, the defendant, McElvain and Vaughn also left and went to the Depot saloon, to which place they went in search of Pillow. Upon arriving at the Depot saloon, where the tragedy occurred, they found Pillow, Sanders and the deceased. McElvain invited the crowd to drink at his expense. Relative to the first difficulty between the defendant and the deceased, the testimony of the defendant's witnesses is substantially the same as that of the State's witnesses, and is to the effect that as the parties were about to drink, the defendant attacked the deceased, the latter asking him what he meant, to which the defendant replied that he (the deceased) had whipped his brother on a former occasion and had kicked him off the train; that the defendant called the deceased a vile name, and continued beating him until the deceased left the saloon. Defendant's own testimony in regard to the first difficulty is not in harmony with that of other witnesses He testified that when he entered the saloon he told his brother-in-law, Pillow, that he must go home; that the deceased interposed, called him a "G—d d—n son-of-a-bitch,"

and said, "What have you got to do with it—I will attend to taking him home," and that he (defendant) then struck the deceased. Several of defendant's witnesses, including himself, testified that as Langdon was leaving the saloon the defendant asked him to come back and have a drink; that the deceased made no response, but in about five minutes returned to the cigar department, carrying a pistol. The testimony is that as the deceased was returning to the saloon he displayed his pistol, and stated in the presence of two or three witnesses that he had had a fight with the defendant, and was going to the saloon to kill him; that upon entering the cigar department he called to the defendant, saying, "Oh, Albert!" That defendant hastily left the barroom and went into the cigar department, and that a struggle immediately ensued between the two men, during the course of which several shots were fired by both; that the two shots first fired did not make a report as loud as the report made by the third shot, and that the pistol used by the deceased was of smaller caliber than that used by the defendant.

The defendant testified that he left home for Caruthersville on the afternoon of March 2, 1908, taking with him a small "Owl Head" pistol, which belonged to a negro who had theretofore worked for him, his purpose being to give it to the negro in case he should see him in Caruthersville. About 6 o'clock that evening his sister, the wife of Clay Pillow, telephoned to him to take Pillow home. He found Pillow, who refused to go home with him, and then he went to McElvain's saloon and requested McElvain to help him to get his brother-in-law to go home. Both McElvain and Vaughn accompanied him to the Opera saloon, where they located Pillow. Before leaving McElvain's saloon he borrowed a big pistol from McElvain. The reason he did this was that he had had a difficulty with one Dave Huffman a few days previously, and that he

had just been informed by one George Rhineheart that "the Huffman gang was coming to town," and that he had better watch them.

With reference to the shooting, the defendant testified that when the deceased entered the cigar department he heard him say "Oh, Albert," and that when he went through the screen door, in response to the call, the deceased greeted him with a curse and presented his pistol; that he (defendant) jumped and took hold of Langdon's arm, and then, pulling out his own pistol, he struck Langdon therewith on the head; that Langdon fired two shots, one of which wounded him (defendant) in the neck, and that he, then, fired at the deceased, but that his pistol failed to go off after the first shot although he snapped it several times; that he fell and dropped his big pistol, whereupon he drew the little pistol which he had on his person, and which belonged to a negro, and fired it, the bullet striking the deceased in the jaw; that deceased also shot him while down, the ball entering his leg.

Some evidence was offered tending to prove that the deceased bore the reputation of being a dangerous and turbulent man, while other testimony tended to prove that defendant's reputation for morality was bad.

## OPINION.

### I.

Defendant challenges the sufficiency of the information, the contention being that it fails to charge with what the assault was made, or that the mortal wound was feloniously given.

Omitting the formal parts, the information is as follows:

"B. A. McKay, prosecuting attorney, duly elected, commissioned, sworn, qualified, installed, and acting as such within and for the county of Pemiscot, in the

State of Missouri, upon his oath and upon his hereto appended oath, informs the court, and upon his said oath and upon his hereto appended oath, does depose, present, aver and charge that Albert Little, late of the county of Pemiscot and State of Missouri, in and upon one Ed Langdon, then and there being, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did make an assault, and with a dangerous and deadly weapon, to-wit, a pistol then and there loaded with gunpowder and leaden balls, 'which he, the said Albert Little, in his right hand then and there had and held at and against him, the said Ed Langdon, then and there feloniously, on purpose, and of his malice aforethought, willfully, deliberately and premeditatedly did shoot off and discharge, and with the pistol aforesaid and the gunpowder and leaden balls aforesaid, then and there feloniously, and on purpose, and of his malice aforethought, willfully and deliberately and premeditatedly did shoot and strike him, the said Ed Langdon, in and upon the left side of him, the said Ed Langdon, giving him, the said Ed Langdon, then and there, with the dangerous and deadly weapon, to-wit, the pistol aforesaid, and the gunpowder and leaden balls aforesaid, in and upon the left side of him, the said Ed Langdon, one mortal wound of the breadth of one inch and of the depth of three inches, of which mortal wound the said Ed Langdon from the said 2d day of March, 1908, the year aforesaid, in the county aforesaid, until the 4th day of March, 1908, the year in the county aforesaid, did languish, and languishing did live, on which said 4th day of March, in the year aforesaid, the said Ed Langdon, in the city of Memphis in the State of Tennessee, of the mortal wound aforesaid died; and so B. A. McKay, prosecuting attorney as aforesaid, upon his oath and upon his hereto appended oath, doth say that he, the said Albert Little, him, the said Ed Langdon, in the manner and by the means aforesaid, willfully, unlawfully, felon-

iously, deliberately, premeditatedly and of his malice aforethought, did kill and murder, against the peace and dignity of the State."

The information is not subject to the criticism lodged against it, but contains every necessary averment, and follows approved precedents. [State v. Heath, 221 Mo. 565; State v. Barrington, 198 Mo. 1. c. 36; State v. Privitt, 175 Mo. 207; State v. Kindred, 148 Mo. 270.] The cases cited by defendant deal with a different form of information, and afford no basis for the attack made upon this.

## II.

The record discloses that the defendant filed a plea in abatement of the information, alleging that the grand jury of Pemiscot county, prior to the filing of the information, returned into court an indictment charging the defendant with murder in the second degree for the killing of Ed Langdon, the same person mentioned in the information, in the same way, by the same means, and at the same time and place as alleged in the information, and that said indictment was still pending and undetermined.

Defendant claims that by reason of the statute (R. S. 1899, sec. 2476), which provides that "that mode of procedure which shall be first instituted by the filing of the indictment or information for any offense shall be pursued to the exclusion of the other, so long as the same shall be pending and undetermined," the prosecuting attorney had no legal authority to file this information, and that the court erred in overruling said plea. This plea, as the record shows, was filed and overruled during the November term, 1908, of the circuit court, and while the cause was pending before the regular judge, Hon. Henry C. Riley. Thereafter, upon defendant's application, the cause was continued until the next regular term, when Hon. J. L. Fort, judge of the Twenty-second Judicial

Circuit, was called in to try the case, and the cause was again continued until another time. The plea in abatement was not renewed, and no term bill of exceptions, preserving the plea, the evidence, if any, in support thereof, or exceptions to the ruling of the court thereon, was at any time filed. By failing to save exceptions at the November term, 1908, the defendant waived any error committed by the court in overruling his plea in abatement. [Richardson v. Agr. & Mec. Assn., 156 Mo. 407; Reineman v. Larkin, 222 Mo. l. c. 156.]

Again, the plea and the exception of the defendant to the court's action in overruling same are found only in the record proper. The only way known to the law for preserving matters of exception is by a bill for that purpose. [State v. Hicks, 160 Mo. 468; State v. Wilhoit, 142 Mo. 619; State v. Reed, 154 Mo. 122; State v. Finley, 193 Mo. 202; State v. Penland, 199 Mo. 152.]

III.

Numerous errors are assigned relative to the instructions given and refused by the court. The first instruction complained of reads:

"A.    The court instructs the jury that if you find and believe from the evidence that the defendant, Albert Little, had shortly before the difficulty, assaulted the deceased, Ed Langdon, then and in that event the deceased was not bound to flee from defendant, but had a right to arm himself, with the honest purpose of protecting his own life, or to defend himself against a further attack by defendant."

The defendant's objection, that the latter part of the instruction submits to the jury a matter not in issue in the case, appears to us to be well founded. There is no evidence tending to show that the deceased armed himself with the honest purpose of protecting his life, or to defend himself against a further

attack by defendant. At the time the deceased went to Barnett's saloon and, contrary to the bartender's wishes, opened a drawer and extracted therefrom a pistol, it cannot be said that he was in any danger from the defendant. The latter did not follow him from the Depot saloon, or threaten to do him any further injury, but on the contrary, according to the evidence, he requested the deceased to come back and take a drink. At least two witnesses testified that just before the deceased entered the Depot saloon he said in their presence that he was going in there to kill Albert Little, and that he held a pistol in his hand at the time he so expressed himself. If a man be apprehensive of danger, and resort to arms for *protection,* and protection only, it is not probable that he will go where the danger is most likely to be found. In other words, he will not seek the danger if his only motive is to defend himself against it. The deceased, it is plain, did not procure the pistol for the purpose of defending himself against any threatened attack. Provoked to anger by the assault made upon him by the defendant the deceased, in procuring the bartender's pistol, and returning to the Depot saloon where the defendant was, could only have been moved by a spirit of revenge. Up to the time of the final combat, in which the deceased was fatally and the defendant dangerously wounded, the defendant had not displayed his pistol, nor could the deceased have known that he had such weapon on his person. It is not shown that deceased was physically injured in the first assault or difficulty, or that his antagonist was a stronger man than he. He could not have armed himself in anticipation of a further attack by the defendant, no threats having been made. For what purpose, then, did he arm himself and return to the saloon? This is answered by the testimony of two witnesses, who heard him say, "I am going in there and kill Albert Little." An instruction may be right in the abstract, but wrong in view of the evi-

dence. It is so with this. The latter part of the instruction is erroneous, there being no evidence to support it.

Instruction "B," given for the State, is objected to on the ground that it is unwarranted by the evidence. It is as follows:

"B. If the jury shall find from the evidence that the State has proven a conspiracy between the defendant, Jerry McElvain and Elmer Vaughn, or with any of them acting with defendant, to whip the deceased, or take his life, or do him some great bodily harm, and that defendant and said Jerry McElvain and Elmer Vaughn, or any of them acting with defendant, killed said deceased in carrying out such design and purpose, then, in considering the guilt or innocence of defendant, you may take into consideration every act and declaration of each member of the confederacy in pursuance of the original concerted plan, and with reference to the common object, which has been given in evidence before you."

The case was tried on the theory that a conspiracy existed between the defendant, Jerry McElvain and Elmer Vaughn to whip or do some great bodily harm to the deceased, and as supporting this theory certain evidence was permitted to be introduced, which evidence, while far from sufficient, as we think, to prove the existence of such conspiracy, was nevertheless calculated to prejudice the jury against the defendant.

One witness for the State testified that at the time of the first difficulty McElvain drew his pistol and held it at his side, but in no way attempted to use it. This witness further stated that Pillow, who had been cursing McElvain at the Opera saloon before the latter came in, drew his pistol at the same time, and, addressing McElvain, said, "I think you are handy with your gun." Before giving this testimony, the witness said, "We had been expecting trouble between Pillow and McElvain." McElvain denied that he drew his pistol,

and his testimony is supported by that of other witnesses who were present at the time. The same witness for the State also testified that McElvain again produced his pistol at the time of the shooting, but that he did not go into the cigar department until afterwards, when the combat was over. Several witnesses both for the State and the defense, who were in a position to see what occurred in the saloon at the time, testified that they did not see McElvain draw his pistol while the combat was in progress.

George Holly, proprietor of the Opera saloon, testified for the State to the effect that when McElvain, Vaughn and the defendant came into his saloon they had their hands in their pockets, but that neither of them made any demonstration against the deceased who was present; that while in his saloon, McElvain told him (Holly), out of the hearing of defendant, that "Albert Little had it in for Ed. Langdon" on account of some old score; that at the time McElvain, Vaughn and the defendant left the Opera saloon, McElvain was carrying a pistol in his hand.

This is the only testimony which has any tendency whatever to show the existence of a conspiracy to injure the deceased, and we do not think this was sufficient to warrant the submission of the question to the jury. The evidence is clear that the defendant, both in the first and second difficulty with the deceased, acted wholly independently of his supposed co-conspirators, and it is not shown that a single word, sign or token passed between them, before or after either of said difficulties, to indicate that they were acting in concert for the accomplishment of a common and unlawful design. Indeed the record is barren of evidence tending to show that either the defendant, McElvain or Vaughn knew, prior to the time of seeing him at the Opera saloon, that the deceased was in Caruthersville that day. Nor is it at all likely that McElvain, if he had conspired with defendant to do

some great bodily harm to the deceased, would tell
Holly, with whom he was not on friendly terms, that
"Little had it in for Ed Langdon." McElvain, if a
party to such conspiracy, would, under the circum-
stances, be far more likely to hide from than com-
municate to Holly any knowledge he might have of
the defendant's feelings or animus toward Langdon.
Again, Holly testified that he and the defendant had
been together nearly all that afternoon, but his testi-
mony does not disclose that Langdon's name was
mentioned by either of them.

The testimony of Elmer Vaughn, a witness for the
defendant, and one of the supposed conspirators, was
more damaging than favorable to the defendant. His
testimony is clear, plain, direct and unequivocal—very
different from that which might be expected from a
man implicated in a conspiracy to commit the crime
in relation to which he was testifying. None of the
testimony alluded to points to a conspiracy, and in-
stead of giving the instruction complained of, the court
should have given an instruction like that asked by
the defendant, which reads: "The court instructs the
jury that there is no evidence in this case to establish
a conspiracy between the defendant and Jerry Mc-
Elvain, or any one else, concerning the deceased, Ed.
Langdon; you are therefore instruted, in arriving at
your verdict, not to take into consideration any of the
testimony offered in evidence of what was said or done
by Jerry McElvain or any other person, not said
or done in the presence or hearing, or with the knowl-
edge and understanding of the defendant, Albert
Little."

The statement made by McElvain to witness
Holly, that "Little had it in for Langdon," was bound
to be prejudicial to the defendant, and as it was not
made in the presence and hearing of the defendant, its
admission, over the objection of the defendant, was
error. Such statement was made at the Opera saloon,

some time prior to the first difficulty which occurred at the Depot saloon, and was no part of the *res gestae;* and as the State failed to prove a conspiracy, the court, after having admitted such statement in evidence, should have instructed the jury to disregard it.

In State v. Newcomb, 220 Mo. 54, it is said: "The law is so well settled that the defendant cannot be bound by statements and acts of third parties made out of his presence, that it needs no citation to establish it, but our own Reports abound in decisions condemning the admission of such testimony." As well said in State v. Jaeger, 66 Mo. 1. c. 180: "If the minds of the jury at this juncture were still tremulous with indecision between the innocence and the guilt of the prisoner, the reception of such testimony was sufficient to turn the scale against him."

The correctness of instruction "C" is challenged, the defendant claiming that it is not authorized by the evidence. It reads: "The court instructs the jury that if they believe from the evidence that defendant had made up his mind to whip Ed. Langdon, and that he borrowed a revolver from Jerry McElvain for the purpose and with the intention of killing said Langdon, if in the judgment of the defendant it should become necessary for him to kill said Langdon in order to accomplish said design of whipping him, and in pursuance to said purpose and intention, defendant provoked and entered into a difficulty with said Langdon and assaulted him, then and in that event there is no self-defense in this case, and this is true regardless of the danger to which the life or limb of the defendant may have been exposed from said Langdon at the time defendant killed him, if the jury shall find from the evidence that the defendant did kill him."

This instruction is faulty in construction, the expression, "if in the judgment of the defendant it should become necessary for him to kill said Langdon in order to accomplish said design of whipping him,"

was manifestly inadvertently used by the learned trial judge; however, aside from this, it is also erroneous as not being warranted by the evidence. As to defendant's object in borrowing a pistol from McElvain there is no evidence whatever save his own, which was to the effect that he feared injury at the hands of the "Huffman gang," on account of a previous difficulty with one Dave Huffman, and wanted the pistol for protection. It is not shown that he knew, at the time he borrowed said pistol, that Langdon was in Caruthersville, and, so far as the evidence goes, his meeting with Langdon was altogether fortuitous and unplanned. The instruction wholly ignores the important fact that a certain period of time elapsed between the assault of whipping and the combat which resulted in the killing, and seems to have been given on the theory that the homicide occurred during the progress, or at the termination of the first difficulty, which is not the evidence. It is well-settled that "though a man should be wrong in the first instance, yet a space for repentance is always open, and where a combatant in good faith withdraws as far as he can, really intending to abandon the conflict, and his adversary still pursues him, then, if taking life becomes necessary to save his own, he will be justified." [State v. Partlow, 90 Mo. l. c. 627; State v. Heath, 221 Mo. 565, and authorities cited.] The evidence clearly shows that the defendant abandoned the conflict. Both men separated, the defendant remaining in the saloon where the difficulty occurred, and the deceased going across the street to Barnett's saloon. After the deceased left the Depot saloon the defendant requested the proprietor thereof to excuse him for raising a disturbance in his saloon, and said, in allusion to Langdon, "I have been owing him that for some time." There is nothing in this to indicate that the defendant intended to do the deceased further injury, and it is quite plain that Langdon's

reappearance, with a pistol, was an unlooked-for occurrence.

The correctness of the following instruction is also challenged:

"D. The court instructs the jury that if they believe from the evidence that defendant had made up his mind to whip Ed Langdon, and that he borrowed a revolver from Jerry McElvain for the purpose and with the intention of killing said Langdon, if in the judgment of the defendant it should become necessary to kill said Langdon in order to carry out his design of whipping him, and in pursuance of said purpose and intention defendant provoked a difficulty with said Langdon and assaulted him [and that said Langdon, while still smarting under a violent passion aroused by said assault, if the jury shall find from the evidence that said assault did arouse a violent passion in the mind of said Langdon, and because of said passion he, the said Langdon, went away and procured a revolver, and returned to the place at which he was killed by the defendant, if the jury shall find by the evidence he was killed by the defendant, and that a reasonable time had not elapsed from the time of said assault to the time of said killing for said passion to subside, and that it had not in fact subsided, and that said Langdon, while still smarting under said passion, and under the influence of said passion, attempted to shoot, or did shoot, the defendant, and defendant shot and killed said Langdon in order to save his own life], then and in that event there is no self-defense in this case, and this is true regardless of the danger to which the life or limb of the defendant may have been exposed at the hands of said Langdon at the time defendant did kill him."

It will be noticed that this instruction, save as to the matter which we have placed within brackets, is the same as instruction "C," except that this recognizes that some time elapsed between the first diffi-

culty and the killing, while the other does not. Most of what we have said in criticism of instruction C is, therefore, applicable to this instruction. But the peculiar vice of instruction D is that it makes the defendant's right of self-defense depend upon Langdon's state of mind at the time he returned and shot or attempted to shoot the defendant. It says in effect that if the deceased, at the time of the combat, was acting under a violent passion aroused by the previous assault made upon him by defendant, then the defendant, by reason of his having originally been in the wrong, and because of the passion so aroused in the mind of the deceased, could not avail himself of the plea of self-defense, no matter to what extremity he might have been reduced in the last encounter. This certainly is not the law. Manifestly the determination of the question of self-defense cannot be made to hinge upon the decedent's condition of mind at the time of the fatal combat. Such doctrine finds no support in the text-books or in the reports of adjudged cases, the questions of "passion" and "cooling time" being always considered in relation to the defendant's state of mind, and not that of the deceased. It could make no difference in this case whether the deceased was in a cool state of mind, or otherwise, at the time he engaged in the conflict and committed the overt act of shooting the defendant. Were he in a violent passion at the time, that would certainly have no tendency to lessen the force of the bullet or to diminish defendant's danger. The defendant could not be deprived of his right of self-defense on the grounds stated in this instruction, and it was error to give same.

The same unauthorized and erroneous doctrine is injected into instruction E, on manslaughter, which reads:

"E. If the jury believe from the evidence that defendant assaulted the deceased, because the deceased

called him a son-of-a-bitch, or that defendant assaulted deceased in a difficulty which he had provoked or brought on with deceased, and that defendant did not assault the deceased for the purpose or with the intention of provoking a fight with the deceased in order that he might have a pretext or excuse to kill the deceased, or to do him some great bodily harm, but assaulted the deceased for the purpose and with the intention of provoking a fight with the deceased in order that he might mave a pretext or excuse to whip the deceased, and that said assault aroused a violent passion in the mind of the deceased, and that under the influence of said passion deceased went away from the place at which he was assaulted, and soon thereafter returned to said place with a revolver, and that the time which elapsed between said assault and the return of the deceased with the revolver was not sufficient for the passion of the deceased to cool, and that it had not cooled, and that under the influence of said passion the deceased attempted to shoot, or did shoot, the defendant with said revolver, and defendant shot and killed said deceased in order to save his own life, you will find the defendant guilty of manslaughter in the fourth degree.''

By this instruction the court in effect tells the jury that defendant's right of self-defense is cut off, and he is guilty of manslaughter in the fourth degree, if the defendant assaulted the deceased with the intention only of assaulting or whipping him, and this although such assault might have been provoked by the latter's calling the defendant a son-of-a-bitch, provided such assault aroused a violent passion in the mind of the deceased and that the same had not subsided at the time he returned and shot or attempted to shoot the defendant.

Premising that the questions of passion and cooling time, as raised, have rightfully no place in the in-

228 Sup—20

struction, it is observable that the instruction fails to submit to the jury the question whether the defendant desisted and withdrew from the conflict, in good faith, intending to abandon it. As before stated, the evidence tends to show that he did do so, and this being found to be the case, then the defendant's right of self-defense revived, and this notwithstanding he began the combat with a felonious and murderous design. [State v. Lockett, 168 Mo. 480.]   In State v. Vaughn, 141 Mo. 514, this court said: "It is the settled law of this State that one voluntarily entering into and engaging in a combat with another *without a felonious design* may abandon the conflict, and if he does so in good faith and is pursued by his antagonist, he may take the life of his adversary if necessary to save his own, and be justifiable in so doing, or be guilty only of manslaughter even if he do not withdraw from the combat."

It is said for the State that the defendant cannot complain of any alleged error in an instruction relating to fourth-degree manslaughter, since he was tried and convicted on the charge of second-degree murder; [citing State v. Dunn, 80 Mo. 681; State v. Talbott, 73 Mo l. c. 358; State v. Jackson, 167 Mo. l. c. 297.] We do not think those cases in point. The evidence in this case warranted, we think, an instruction on fourth-degree manslaughter, and the trial court evidently thought so. Having, at the instance of the State, given such instruction, it was required to be correct. [State v. Barton, 214 Mo. l. c. 323.] The court did give another instruction on the same offense, which is not objectionable, nor objected to, but that did not cure the error of the instruction quoted.

At the instance of the defendant the court gave five instructions, one of which was the ordinary and frequently-approved instruction on self-defense, but which was qualified by the court by adding thereto these words: "But if the jury shall believe and find

from the evidence that the acts and conduct of the deceased, which produced in the mind of the defendant, as a reasonable man, the fear of such apprehended danger to his life, or limb, were the result of a violent passion aroused in the mind of the deceased, either by an assault made upon the deceased by the defendant because the deceased called the defendant a son-of-a-bitch, or by an assault made upon the deceased by the defendant in a difficulty which the defendant provoked, or brought on, with the deceased, and that said passion had not had time to cool, and had not cooled, you cannot acquit the defendant on the ground of necessary self-defense, but must convict him of either murder in the second degree, or manslaughter in the fourth degree.''

For reasons hereinbefore given, this qualification of the instruction by the court was error. It is but a repetition of the idea that the violent passion of the deceased (if such existed, and was provoked by the assault made on him by defendant, and had not subsided at the time deceased shot or attempted to shoot defendant) operated to deprive defendant of his right of self-defense.

Whereas the evidence in this case shows that the two difficulties between defendant and deceased were separate and distinct, the court treated the two as one continuous combat, the passion of the deceased, if such existed, being the agency whereby the union or combination of the two difficulties was effectuated. To this mistake the errors pointed out in instructions C, D and E, and in the amendment to the instruction on self-defense, are mainly traceable.

A case peculiarly in point is that of Brazzil v. State, 28 Tex. App. 584. In that case the defendant, on first meeting the deceased, was the aggressor, striking him on the head with his pistol. But, having disarmed the deceased, and pursued him a short distance, the defendant abandoned the pursuit, saying that he

could not shoot a man in the back. The deceased then withdrew to another building, and examined the wound he had received. After the lapse of a few minutes, deceased returned at a rapid gait, and in an angry and threatening manner, to where the defendant was standing. The latter called to him to stop; that he did not want to shoot him. Notwithstanding this, the deceased continued to advance, grappled with the defendant, and was shot. The court said: "We think it evident that though the defendant had provoked the original contest for the purpose of bringing on a deadly combat, yet he most clearly and unmistakably abandoned the same, and withdrew from it in good faith, and under circumstances such as fairly to advise Matthews that his (the latter's) danger was past. Matthews, without pursuit from defendant, had crossed the street and secured his safety beyond all question in another storehouse. So far as defendant was concerned, it appears that the contest was entirely and completely at an end—he was not even threatening to renew it. Such being the case, the former or first difficulty had nothing to do with the second and last, save to illustrate the malice by which the parties might be actuated in engaging in a second. Its relation to the second would be about the same as though it had happened the day, week or month before. It would only be legitimate evidence as to ill-will and former grudges on the question of malice or the intent of the parties. In his charge to the jury the learned trial judge has treated the case mainly as presenting but a single, continuous combat, and upon the main phases has iterated and reiterated to the jury that defendant could not claim his defense if he brought on or produced the conflict. If defendant did not bring on or provoke the last difficulty, then his right of self-defense was perfect, and in no manner abridged by the first, which he had abandoned and absolutely withdrawn from, and which was in fact at an end and a

matter of the past. [Oakley v. Comm., 11 S. W. (Ky.) 72. The question of provoking a difficulty, if necessary to be submitted at all, should have been expressly limited to the acts and conduct of the parties in the last fight.''

The law as stated by the court in the Texas case is eminently applicable to the facts of this case. In the Texas case it is not shown that the deceased was armed when he engaged in the second difficulty, while it is clear from the evidence in this case that the deceased was armed when he engaged in the final combat; and the evidence would indicate that he did not arm himself for the purpose of defense but attack.

Upon the facts developed in this case the defendant requested the trial court to give the following instruction numbered 11.

"11.    The court further instruct you that even though you should believe from the evidence that the defendant, Albert Little, was the aggressor and brought on or assaulted the deceased, Ed. Langdon, in the first difficulty testified to as happening in the Depot saloon, and that in said difficulty the defendant acted without just cause or provocation; yet if you further find and believe that defendant and deceased voluntarily abandoned said difficulty, and that deceased, Ed. Langdon, left said saloon and went out and armed himself with a dangerous and deadly weapon, to-wit, a pistol, and came back to said saloon where defendant was, for the purpose to and did renew the difficulty with the defendant, then the court charges you that the first difficulty gave the deceased no right or legal excuse to renew the difficulty, and did not deprive the defendant of any of his rights of self-defense in this last attack, and if you find Langdon did attack him, the defendant had the same rights to defend himself, or the right of self-defense as defined in the other instructions, which he would have had, had no prior difficulty occurred between said defendant and deceased.''

While this instruction may be objectionable in form and verbiage, yet the defendant was entitled to a correct one embodying the principle suggested by the one requested. It was sufficient at least to call the court's attention to the theory it presented, and as such theory was fully supported by the evidence, it was the duty of the court to give a correct instruction covering the subject suggested by the one requested and refused by the court. [State v. Adler, 146 Mo. l. c. 25.]

Other minor errors are called to our attention, and which will doubtless be corrected upon a retrial of the case.

For the errors noted the judgment is reversed and the cause remanded for retrial. All concur.