THE STATE v. EUGENE MULL, Appellant.—300 S'. W. 511.

Division Two, December 12, 1927.

*Louis J. Rasse, Com. P. Storts* and *Lyons & Ristine* for appellant.

650

*North T. Gentry*, Attorney-General; *A. M. Meyer*, Special Assistant Attorney-General, and *L. Cunningham*, Assistant Attorney-General, for respondent.

DAVIS, C.—The Prosecuting Attorney of Saline County on May 11, 1925, filed a verified information in the circuit court charging defendant and one Portwood Bell with murder in the first degree. The person charged to have been murdered was one C. W. Rex. A severance was granted and, on change of venue, defendant was tried in Lafayette County, the jury convicting him of murder in the second degree and sentencing him to fourteen years in the penitentiary. An appeal to this court was duly granted.

The facts developed on the part of the State warrant the finding that on March 12, 1925, at Marshall, in Saline County, defendant and Portwood Bell were in the dwelling house of Bert Simpson, a negro. There was present at that time Mull, the defendant, Bell, two negro women and Coffey. While Mull and one of the negro women were scuffling, the deceased Rex in company with one Raymond Jones drove to the house in a Ford car. Both alighting, they went to the house, Rex succeeding in gaining entrance upon knocking; but the door was shut in Jones's face. Rex called for Bert Simpson twice, and thereupon defendant came from the east room, hit Rex and knocked him down. One of the negro women then separated them according to the evidence of Coffey, Rex going out the back door around to the front yard, with Bell emerging through the front door, closing it.

According to Raymond Jones, when Bell came out of the house he did not hear Bell say anything, but heard Rex say to Bell, "I will get you," upon which Rex started to the car with Bell after him. After skirmishing, struggling and scuffling around and back of the car, Rex ran across the street with Bell following him. Thereupon Bell grabbed him, hitting him behind the right ear with the butt of a knife. Rex fell backward and was getting up on his left elbow when Jones left. There was no gun or weapon in the car to the knowledge of the witness.

Witness Mabery stated in substance that he and Thomas Ballowe were passing the Simpson house when Rex and Jones drove up in a car, Rex going to and entering the house. Jones followed, but was unable to get in. Rex had been in the house about two minutes when he came out. Rex came out of the front door with Bell behind him.

After Rex had proceeded into the yard ten or fifteen feet away, Bell was standing on the porch. Rex then said to Bell that he was going to have him arrested. Bell then said, "I will learn you how to have somebody arrested," upon which he pulled a knife from his pocket. As Bell came off the porch, Rex ran, Bell catching him. A scuffle took place and Bell hit Rex, upon which he fell backward on the sidewalk. Three or four minutes after Bell left, defendant came off the porch, advancing to where Rex was lying and, picking up his hat on the way, laid it down beside Rex. He then grabbed Rex by the hair, raising his head and slapping him two or three times in the face. He then turned his head loose, dropping it back down. The slapping was with the open hand and not hard, but the head on being turned loose hit the sidewalk pretty hard. Defendant returned to Simpson's house. Rex never moved after he fell upon being hit by Bell. As witness came to him Rex was still alive.

Witness Ballowe stated that he saw defendant pick up Rex by the hair, raise his head about knee-high, then slapping him and letting his head fall back. Witness then saw defendant attempt to kick Rex, but it was more of a shove than a kick. Defendant in departing walked as though he was intoxicated.

R. L. Hyatt, Presiding Judge of the Saline County Court, stated that defendant, acting as though intoxicated, came across the street, ran to Rex, caught him by the hair, raising him to a sitting posture, and then slammed him down once. It was with enough force to make the body kind of quiver, but witness did not know whether it was the lick or shock that shook him. He was about forty feet away and heard a noise like a head hitting concrete.

Mrs. Cravens, the daughter of Judge Hyatt, who was with him, stated that she saw defendant cross the street to Rex, pick him up by the hair, slap him a couple of times with his hand on the cheek and drop him to the sidewalk.

Witness Barnes, a shoe worker, stated that defendant ran across the street to Rex, kicked him somewhere in the side once or twice, reached down, picked him up by the hair, raised him to about the waist, and then slammed him pretty hard against the walk. He could hear the report when his head hit and it approximated the bursting of a paper bag.

Witness Bullard stated that defendant smacked the back of Rex's head twice against the sidewalk; that they were pretty good jolts. Rex kind of trembled all over. Defendant shook him. He did not see anyone kick Rex. While Bell and Rex were scuffling, Bell struck deceased with the knife, the deceased falling backward and striking his head on the concrete.

Witness Moore testified that, while a block or more away, and while looking down the street, he saw defendant have a man by the top of the head, jamming it up and down on the sidewalk and it looked like he kicked him a time or two. On coming up, when witness came within ten or fifteen feet of the body, they put him in a car and carried him away. The witness was four or five hundred feet from him when he saw the man's head slammed down. He did not hear the report of a head hitting the sidewalk. He stated that the man was either slapped or kicked.

The testimony of the physicians established an autopsy, tending to show that an incision about an inch wide and six or seven inches deep, made by a knife thrust, penetrated Rex's liver. There were some bruises on the back of the head and a very bad, severe bruise just back of the left ear. The knife did not go in straight, but must have penetrated at least six inches from the outside into the liver. It was in a vital part of the body. The bruises on the face were unimportant. There was no evidence that the bruise behind the left ear was done with an instrument. The bruise behind the ear was on what is known as a bone of the mastoid process, which is a vital part of the body. It would take a very severe blow to produce the wound found there. There were some bruises, some clotted blood on the back of the head, but no fracture of the skull so far as the witness could tell. There was some clotted blood on the back of the head showing it had been produced by some blow or ruptured blood vessel. It would take a very severe blow to produce that. The bruise on the back of the head was a vital part of the body because it is at the base of the brain. Any or all of the wounds described could have caused the death of Rex. It was further stated that the one at the back of the left ear might or could have caused death, and that the one on the back of the head alone might not have caused death.

The State's evidence tended to show that defendant was taken into custody a little after six P. M. on March 12, 1925, and that defendant was then apparently under the influence of liquor.

It is unnecessary to state the evidence on the part of the defendant in full, but the salient testimony for the defendant tends to show that, after the scuffle between Bell and Rex, defendant walked across the street, took hold of Rex, shook him and said, "Get up, you are not hurt." He took hold of his head somewhere to raise him up, but Rex could not stand, for he was too limp. Defendant then let him drop back some, slapping him lightly a couple of times in the face. Defendant then said to him, "Wake up! Wake up!" Failing to do so, defendant glanced down and saw some blood on his clothes, so he slid him down and went home. One witness for defendant stated

that defendant let loose and deceased fell back pretty hard. Such other facts as are pertinent, if any, will later appear.

I. The failure of the trial court to instruct the jury on manslaughter where the evidence justifies it, even though not requested, constitutes reversible error, provided the motion for a new trial preserves the question. [State v. Burrell, 298 Mo. 672, 252 S. W. 709.] In the instant case defendant offered an instruction on the subject, and in his motion for a new trial complained of its refusal and of the action of the court in refusing to properly instruct the jury relative thereto.

It is evident from the foregoing declaration that the motion preserves the question, causing a review of the evidence to determine whether an instruction on manslaughter was apropos. The State's evidence develops that defendant staggered across the street to where deceased lay, raised him by the hair to a sitting posture, and slapped him lightly in the face, finally letting loose so that he dropped back, the back of his head striking the concrete sidewalk fairly hard. The history of the case as developed by certain State witnesses shows nothing more than the release of deceased, without malice, design or intent to do him bodily harm. An inference may be drawn from these facts that defendant, intending to aid deceased and desiring to restore him to consciousness, raised him by the hair and slapped him under the belief that he was not seriously hurt, but that his comatose condition was due to what is pugilistically termed a knockout, to be readily restored by means of the shock of slaps in the face. It is true that defendant, according to these witnesses, turned him loose, but with an inference from these facts obtaining that defendant intended to aid deceased by restoring him to consciousness, we fail to see an intention on his part to do deceased harm. It may be inferred, however, from these facts that defendant, negligently and without using caution or skill, permitted deceased to fall back, thus causing the back of his head to strike the concrete hard. There is testimony that the wounds on the back of the head were at the base of the brain, a vital spot, and that they could have caused death. One phase of manslaughter is the doing of an act, otherwise lawful, without malice or design, negligently and without proper caution, causing bodily harm resulting in death. It is clear, we think, that it may be inferred from the facts in evidence, that defendant negligently, but without design or malice to do Rex bodily harm, turned his body loose, permitting his head to strike the concrete. These facts justified an instruction involving manslaughter and the court erred in refusing one.

II. On direct examination to impeach Raymond Jones, witness for the State, M. T. Bell, brother of Portwood Bell, stated that Jones told him that deceased carried two knives and that at the time of the trouble deceased had a gun in the car, Rex saying to Portwood Bell, "I am going to get a gun and kill you." On cross-examination the witness was asked the question: "I will ask you if at the time your brother hadn't been convicted in the Circuit Court of Saline County for murder in the first degree—on this charge for murder in the first degree, and you were trying to get affidavits to file for a motion for a new trial?" On objection to the whole matter the court struck from the question the words "murder in the first degree," and ruled that the question must be answered.

While an examiner of the witness is permitted wide latitude on cross-examination, such latitude does not extend to incompetent, irrelevant, and immaterial matters. Even though defendant and Portwood Bell were jointly informed against for the same offense, the conviction of Bell prior to defendant's trial neither tended to establish defendant's guilt nor develop joint action on their part. [16 C. J. p. 670, par. 1341.] Whatever the purpose of the question, it was especially prejudicial in this instance for the record fails to develop joint action or a conspiracy on the part of defendant and Bell. [State v. Bell, 289 S. W. 619.] It follows that error occurred in this particular.

III. We think the court erred in refusing to permit defendant to interrogate witnesses Vaughan and Gray for the State as to whether the witnesses knew their own reputation for morality in the community in which they resided. The court should not have reprimanded counsel for defendant for asking the question and should have permitted them to make an offer of proof to that effect. [State v. Wade, 270 S. W. 298.]

IV. Under Section 4079, Laws 1925, page 198, as construed by State v. Standifer, 289 S. W. 856, we may not consider the general assignments of error relating to the giving and refusing of instructions and the admitting and rejecting of evidence, for the matter complained of must be set forth in the motion for a new trial in detail and with particularity in separate numbered paragraphs, stating the specific grounds or causes therefor.

V. It is contended that the court erred in refusing to direct the jury to find defendant not guilty of murder in the first and second

degrees. Inasmuch as the record is without evidence of any kind or description of joint action or conspiracy on the part of defendant and Bell to do deceased injury or bodily harm, we eliminate from the discussion of the question the responsibility of defendant for the acts of Portwood Bell. The State's evidence tends to show that Bell advanced to the front porch without any intention whatever to do deceased harm. Whatever thereafter became his intention, it is certain from the evidence that he held no communication with defendant. The record is further without evidence tending to show, prior to that time, that defendant and Bell acted jointly or confederated together to do deceased harm. No intention on the part of Bell to do deceased harm is shown until deceased threatened him with arrest, or threatened "to get him." The prior difficulty between defendant and deceased, on the arrival of deceased at the house, had come to an end. There is no evidence that Bell participated in that difficulty except to separate defendant and deceased. There is therefore not a scintilla of evidence that defendant aided, abetted or acquiesced in the encounter between Bell and the deceased. It results that defendant was not and is not, according to the evidence, responsible for the acts of Bell. [State v. Bell, 289 S. W. 619; State v. Odbur, 295 S. W. 734.]

It results that evidence of murder in this cause is limited to some personal act on the part of defendant tending to show that he was guilty of murder in either the first or second degree. We find evidence in the record tending to show that by his conduct defendant acted designedly. One witness, some distance away, testified that he saw defendant slam deceased's head once on the concrete. A second witness said that he slammed him pretty hard against the sidewalk, so that he heard the report when his head hit. Another said he smacked the back of his head twice against the sidewalk, pretty good jolts. Still another, four to five hundred feet away, stated he saw defendant have a man by the top of the head, jamming it up and down on the sidewalk. The foregoing facts constituted evidence of murder in the first and second degrees. While these facts are irreconcilable with other testimony for the State tending to show that defendant negligently released deceased, whereby his head was permitted to strike the concrete sidewalk with force, yet, notwithstanding the conflict, all the evidence was before the jury and it was their province to determine the effect of it. If the jury believed that defendant with malice and design slammed or jammed Rex's head against the sidewalk, then defendant became responsible for the consequences, provided the jury further believed that such acts caused or contributed to his death. In this regard, the evidence

tends to show that the bruise on the back of the head could have caused death, but it might not have done so. It was also a question for the determination of the jury, in view of the State's evidence that Bell felled Rex with a blow, causing the back of his head to strike the concrete sidewalk, whether the bruise on the back of the head was caused by any act of defendant. While these questions were for the jury under the facts, still the trial court did not err in submitting to the jury the issues of murder in the first and second degrees.

Inasmuch as other alleged errors may not again occur, we refrain from discussing them. For the errors noted the judgment is reversed and the cause remanded for a new trial. *Higbee* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur, except *Walker*, *J.,* who dissents.