STATE v. IDA AITKENS, Appellant.—No. 38730.—179 S. W. (2d) 84.

Division Two, April 3, 1944.

*R. H. Musser, Frank W. Armstrong,* and *A. R. Alexander* for appellant.

*Roy McKittrick,* Attorney General, and *Covell R. Hewitt,* Assistant Attorney General, for respondent.

■ ELLISON, J.—The appellant, 32 years old, was convicted in the circuit court of Lafayette county, on change of venue from Clinton county, of murder in the second degree for the killing of Bertha Lorene Aitkens, a female child 14 months old, by choking and smothering her. The punishment assessed by the jury was 18 years' imprisonment in the pententiary. We have concluded the cause must be reversed and remanded. For that reason we shall discuss only such assigned errors as may recur on retrial. These challenge the sufficiency of the evidence; the admission in evidence of appellant's written and oral confession; and the giving and refusal of instructions. But first, as briefly as possible we state the facts.

The deceased infant was one of the six children of Mr. and Mrs. Fred Aitkens, and the appellant is the wife of Fred's brother Harry, the latter couple having two children. The two families lived across the street from each other near the Santa Fe railroad track in Plattsburg, Clinton county. There was testimony that the relations between them were strained, appellant having told her children to beat the Fred Aitkens children, and herself having threatened them.

The Fred Aitkens infant was in the toddling stage of walking. On the morning of her death, September 1, 1940, between 9:30 and 10:30 o'clock she was playing with her brother and sisters, and soon disappeared. The father began a search and presently the fact that the child was missing was broadcast over a public address system in Plattsburg. By afternoon a crowd of four or five hundred people had gathered. About dusk a mill pond some three blocks from the Aitkens home was drained without result. Near 9 o'clock that night the corpse of the infant was found by a searching party about 3/4 mile from the Fred Aitkens home in a pool of shallow water below a railroad trestle. The railroad track runs close to the two Aitkens' homes on a grade several feet lower, and the space between was covered with tall weeds except for a short distance. Several witnesses testified that one could go from appellant's home to the railroad track and thence to the trestle without being seen, but this was disputed.

Dr. Spalding and Dr. Templeman, an osteopathic physician who then was coroner, made an examination of the corpse about midnight. The body was severely congested but not bleeding. The face was congested quite a bit and there were superficial ■ bruises and

scratches thereon, but none on the torso or the palms of the hands or soles of the feet. However the skin of these was slightly wrinkled. The vagina had a smooth cut in front and a rough torn laceration in the back, which looked as if it had been pried open, extending clear into the rectum for the upward depth of an inch. It would admit two fingers whereas normally the aperture would only pass an object the size of a leadpencil. A post-mortem examination the next day disclosed that the lungs contained no water.

One State's witness testified to having a conversation with appellant about midafternoon. She seemed very nervous; wondered why everyone was just standing around; and exclaimed: "Why in the hell don't they quit looking for the baby, they'll find it tomorrow down by the railroad track, with its head cut off." The witness asked what time the train came through and appellant answered that "no train came (would come?) through that day." Deputy sheriff Oliphant of Clinton county said that about 8:30 or 9 P. M. that night appellant asked him "why everybody suspicioned her of knowing about this baby and where it was." The witness answered. "Well I did not know they suspected you" and appellant answered "Well they do." Being asked who did, she answered, "everybody." However, she admitted none of the officers had accused her. A few minutes later while she was standing in her yard appellant said to Oliphant "If the crowd would go home and come back the next morning and look along the railroad track she thought they would find the baby— or that they would find the baby out there." Following that incident deputy Oliphant suggested that the aforesaid search be made along the railroad track, and it was soon made.

A state trooper testified that about 9:30 P. M. before the searching party had reported the infant had been found dead, he and prosecuting attorney Bennett talked to appellant in her kitchen. Bennett told her many a finger pointed at her and her husband. She answered she didn't see why; and that "she wouldn't think of killing little Bertha Lorene." In that conversation prosecuting attorney Bennett questioned the appellant about some spots on the dress she was wearing; and asked her to let the officers send it to patrol headquarters at Jefferson City for analysis. She consented, and they also got the slippers she was wearing and her husband's pocket knife. No blood spots were found on any of them in the laboratory. Also a smear from the infant's vagina was taken by the doctors. On microscopic examination nothing was discovered indicating sexual abuse of the child by any male.

About a week after the child's death the appellant made a first written statement in which she charged her husband had confessed to her that he killed the infant. She was arrested on September 27. Several days later in Kansas City she made a second written statement to the same effect. Following that, about October 3 in the Kansas

City jail she made a third written statement in which she confessed she had held her hand over the infant's mouth until it died. After hearing the testimony of deputy Oliphant as to the voluntariness of the statements, particularly the third one, at a preliminary inquiry out of the presence of the jury, the trial court excluded the first and second written statements, but announced the third statement would be admitted in evidence. Appellant's counsel offered no countervailing evidence at that time, but objected, saying that probably when the evidence was heard (by the jury) her objections could be taken up and the court could control the matter by instructions. The court then announced "I am going to admit exhibit 12 (the confession) in evidence."

That statement accounted for the infant's death in this manner. Appellant said she was coming out of a shed in her yard about 9:30 A. M. with some fruit jars and accidently stumbled over the infant, who began to cry loudly. She put her hand over the child's mouth to silence its cries fearing they would be heard by its parents, who were unfriendly to her. The child lost its breath and did not regain it. She left the child's body in the shed covered with sacks until about dark, and then mutilated it with her husband's knife to make it appear there had been a criminal attack. Then she took the corpse down the railroad track and put it in the pond under the bridge. In this statement she said her two previous statements were false. It was considerably longer than we give it here and concluded with the declaration that she was making it of her own free will and realized it could be used against her. We would surmise the language in it was better than appellant would be capable of. The statement was signed by her; also by deputy sheriff Oliphant, deputy sheriff Purdome and jail matron Huffman of Kansas City, as witnesses.

A day or two later, appellant went back to Plattsburg with four officers and reenacted her movements in connection with the homicide, using a doll to represent the infant. The party included a news photographer who took photographs that were introduced in evidence. The officers testified her oral statements and acts corroborated her written confession; and that she acted entirely independent of any control or suggestion by them. At the trial appellant renounced this dramatization, saying she had been prompted and posed by the officers; had followed their directions throughout; and that they slapped, knocked and beat her, and called her vile names.

After the court had announced at the preliminary inquiry that he would admit in evidence the third statement, or confession, the jury was recalled and deputy sheriff Oliphant again testified about its voluntariness. He admitted he had talked to appellant frequently about the case during the three weeks she had been in the Kansas City jail before the confession was made. That night appellant's

cousin Herbert Russell and her husband Harry Aitkens were with him. They arrived near 8 P. M. The matron, Mrs. Huffman, brought appellant to the office. After some conversation about the case appellant's husband said, "Ida, why don't you tell the truth." They were sitting together on a settee. She began to tell what occurred, and about 9:30 or 10 P. M. asked that chief deputy Purdome be called from his home. He arrived in about an hour. Appellant made her statement orally and Purdome dictated it to a typist. The matron said it contained appellant's "exact words"; but Purdome said only "as nearly I suppose as she could give it to us and it could be translated to someone to take on the typewriter." The whole elapsed time was about two hours. Appellant said "she felt a lot better now that she had told the truth about everything;" and her husband said: "Yes, I will be waiting for you when this is over."

Appellant repudiated the confession, testifying that Oliphant advised her to make it and plead guilty; and that he would divide the reward money with her and get her out. She denied her husband and cousin, and matron Huffman, were present when she made the confession, saying her husband had been ejected from the room and locked in a cell about 20 minutes after his arrival, when he interfered after Oliphant had slapped her. This was denied by the matron and Purdome, who declared the whole party remained in the jail office all the time. Her husband and cousin did not testify, but as regards the husband this is not to be counted against her, in view of Sec. 4082.[1] And the matron admitted appellant's husband had been arrested for something at some time not shown; and Oliphant admitted on recross examination that a reward had been offered; and that he was claiming it.

Appellant further testified at length, denying her guilt altogether, and asserting her written confession was obtained by force, threats, trickery and promises of leniency, mostly by Oliphant and Purdome. She signed the confession but did not read it. Both these men told her the laboratory examination of her dress and shoes and her husband's knife showed blood thereon; and the shoes showed scrapings of rock and gravel. They told her she might as well confess; that they would fix the statement to make it appear the infant's death was accidental and get her out in six months; that she then could go back to her children, who otherwise would be sent to a home. They also wanted her to accuse her little boy of the crime.

She said they talked to her for three consecutive days, questioning her night and day, except two hours in the daytime. Oliphant had a key to her cell and would come and go at will. On the day of the confession they talked from the morning through the afternoon, and until two o'clock in the morning. She had nothing to eat half of

---

[1]Citations to our statutes are to R. S. 1939 and Mo. R. S. A. unless otherwise noted.

the time. The matron also talked to her. When Oliphant left that night he kissed her and said he would see her soon and take her back to her children. He took with him a note from appellant to her mother in Plattsburg. Oliphant admitted in his testimony that he did deliver the note that same night, and knew what was in it. But he emphatically denied kissing her; making any promises or threats; and that he had a key to her cell and visited her alone. Purdome was not recalled as a witness.

Appellant further testified that on the day ▓ of her confession Purdome talked to her in his office, and for the first time she told him (and also Oliphant and the matron, then or later) that on the day after the tragedy a neighbor boy, Harold Abramson, admitted to her his police dog had lunged at the infant and knocked it off the porch, following which it "went limp." He said he later mutilated the infant with her husband's knife and took it to the railroad trestle. She declared she didn't tell the story because Abramson threatened her and her children, until Purdome told her he had gone away. Both Purdome and Oliphant instructed her to keep still. Oliphant and the matron denied appellant had told them this story. The only defense witness beside appellant was her twelve year old son, Harry. The boy generally corroborated his mother concerning her whereabouts on the day of the homicide, and later when the corpse was taken to the railroad trestle according to appellant's confession. Both of them saw Abramson and his police dog during the day.

Three physicians testified as to the cause of the infant's death. Two of them, Drs. Spalding and Templeman, had conducted the post-mortem examination and autopsy, and were familiar with the condition of the corpse. Dr. W. R. Moore of St. Joseph, a specialist in diseases of children, had treated the child about 13 months before but did not see the corpse. All of them gave expert opinions based on a hypothetical question which described the corpse and assumed that the hands of some person had been placed over the mouth and nostrils of the infant. Dr. Spalding thought that in the stated circumstances death would ensue from smothering within 1 to 5 minutes; and that the child's semi-conscious reflexes would cease within 1 to 2 minutes. He described the stages of suffocation through which the infant would pass, and said the face would become blue and congested, a condition that would remain after death. Dr. Moore thought it would take 3 to 5 minutes to produce death. All believed the cause of death would be smothering.

Dr. Spalding, at least, was led to that conclusion because the face and body of the child were congested, which would be a natural result of smothering; and also because the bruises and scratches on the face were superficial; and not such as would have resulted from a severe blow, as by the child's falling or being thrown from the railroad bridge into the water, where there were some stones.

Another reason was that the scratches were not bleeding, whereas if inflicted before death they would have bled more profusely. The fact that the skin on the palms and soles of the feet were slightly wrinkled indicated the corpse had been in the water an hour or so; and the fact that the lungs contained no water indicated death had not been caused by drowning.

■ Appellant assigns error on the admission in evidence of her written confession and of the State's testimony concerning her re-enactment of the alleged homicide—this on the ground that these admissions of hers were not voluntary. In so arguing her counsel assume the truth of *her* testimony that they were coerced. But the officers swore to the contrary. Her husband's adjurations for her to tell the truth would not invalidate the confession.[2] Viewing the evidence adduced on both sides we must hold it presented a question for the trial judge and jury.[3] Further arguing, appellant maintains the confession was presumptively obtained through the exertion of the "same" improper influences that induced her to make her first and second written statements, citing State v. Tharp, supra, 334 Mo. 1. c. 47, 64 S. W. (2d) 1. c. 255-6, and other like cases. But the first two written statements were not *confessions*; they were self-serving accusations against her husband. And they were not excluded because they had been improperly obtained, but because they were hearsay and immaterial.

The Tharp case and five others are also cited to the proposition that a confession induced by a person in authority (a law officer) while the defendant is in jail is presumptively involuntary. But none of these cases so hold. A confession is not presumptively invalid merely because it is taken by an officer while the accused is in custody. See many cases cited in 9 West's Mo. Digest, "Criminal Law," sec. 519(3). There must further be some improper influence exerted by the officer. It is urged, likewise, ■ that the age, sex, disposition and past experience of the appellant are persuasive in determining whether her confession was voluntary;[4] and concededly these are factors to be considered. There was testimony that she was nervous; but having in mind that she was 32 years old, her various conflicting stories, her inventive talent, turbulent disposition and all the other evidence, we are unable to agree that the considerations first named furnish any reason for overturning the ruling below.

■ The point stressed by appellant is that taking her confession at face value it shows only accident or misadventure and did not

[2]State v. McGuire, 327 Mo. 1176, 1184, 39 S. W. (2d) 523, 525; State v. Tharp, 334 Mo. 45, 54-5(8, 9), 64 S. W. (2d) 249, 254-5(9, 10); State v. Williamson, 339 Mo. 1038, 1044(1, 2), 99 S. W. (2d) 76, 78(1, 6).

[3]State v. Gibilterra, 342 Mo. 577, 585, 116 S. W. (2d) 88, 93(4); State v. Menz, 341 Mo. 74, 92(9), 106 S. W. (2d) 440, 448(12).

[4]State v. Powell, 258 Mo. 239, 248, 167 S. W. 559, 561(1); State v. Meyer, 293 Mo. 108, 113, 238 S. W. 457, 458(3).

warrant an instruction on second degree murder; because it negatived any criminal intent, and also because there was no evidence as to how long she held her hand over the infant's mouth, or how much time elapsed before the infant died. But two of the physicians testified that it would take a minimum of from one to three minutes and a maximum of five minutes to kill the infant in that manner; and one of them said its struggles (reflexes) would continue for one or two minutes. Appellant's own admission is that she continued thus to smother the infant long enough for it to lose its breath and die, during which time, according to the testimony of Dr. Spalding, the child's face would visibly become blue and congested. Without any doubt this was sufficient to make a question for the jury as to whether the appellant was guilty of intentionally doing a homicidal act which resulted in death. If she did the verdict of second degree murder was warranted.

Appellant further complains the testimony that she mutilated the infant's body was improper because it showed an independent crime. We are unable to find that the act of mutilating a corpse before interment is an offense under our statutes (Sec. 4727) though it apparently was at common law, 17 C. J., sec. 28, p. 1148, and there would be civil liability. Patrick v. Employers' Mut. Liability Ins. Co., 233 Mo. App. 251, 118 S. W. (2d) 116. But even so, the evidence was a part of appellant's confession and was closely connected with the crime charged. She committed the act to divert suspicion from herself—in other words, to conceal the crime *she* had committed and create conditions indicating a sexual crime perpetrated by a male. The proof was therefore competent as tending to establish her identity, guilty knowledge, and absence of mistake or accident, on the same theory as if she had fled or attempted to conceal or destroy the corpse. State v. Hepperman, 349 Mo. 681, 694, 162 S. W. (2d) 878.

The seventh assignment charges error in the State's instructions S 5 and 6, which informed the jury of general circumstances they might consider in determining whether the appellant's written confession was voluntary; and that no such statement, written or oral, true or false, in relation to the offense charged, made to the officers while she was in their custody after arrest, could be considered as evidence against her, unless voluntary. It has been held the court is not required to instruct on the voluntariness of a confession as part of the law of the case under Sec. 4070(4), without a request therefor; but if an instruction is tendered and is not in due form, the court should give a proper instruction unless the question is sufficiently covered by others. State v. Gibilterra, supra, 342 Mo. 1. c. 585-6, 116 S. W. (2d) 1. c. 94(5-7). The only objection that could be made to the above instructions 5 and 6 is that they failed to define "voluntary" by specifying the *improper* influences

from which the accused must be free. Usually this is done. But the vice in the instructions here, if any, merely was that they were too general; and the court gave an instruction No. 13 for appellant which covered the whole ground. So we hold there was no error.

Two assignments complain of the refusal of appellant's requested instructions D 2 and 3. One told the jury that in determining whether appellant's written confession was voluntary, her sex, age, disposition, education, physical health, experience and the fact of her imprisonment or *"illegal* custody" were matters they should give such weight as they thought proper. The other declared the appellant's written and oral statements, true or false, should not be considered as evidence against her "unless *entirely* voluntary" (above italics ours). In the circumstances of this case we think the first instruction would have been an unwarranted commentary on the evidence. The second was covered by appellant's given Instruction D 13. And both were faulty in form because of the use of the intensive words above italicised. We hold there was no error in refusing them.

Finally, appellant complains that instruction S 7, given for the State, was erroneous, in that it failed to instruct the jury fully on the law of excusable homicide and because it conflicted with instruction D 11, given at her request. The criticized instruction S 7 was based on appellant's testimony that she had placed her hand over the infant's mouth merely to keep its parents from hearing its cries, and without any harmful or unlawful intent. It told the jury that "excusable homicide as used in these instructions is defined as any"—and from thereon followed the language of the first clause of Sec. 4380 which we italicize[5] in quoting the statute, as follows: "Homicide shall be deemed excusable when committed by *accident or misfortune,* in either of the following cases: First, in lawfully correcting a child, apprentice or servant, or *in doing any* other *lawful act by lawful means, with usual and ordinary caution,* and *without unlawful intent;* or second, in heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner." (This second clause was not covered by the instruction and has no application to the instant case.)

Appellant's brief first urges that instruction S 7 erred in adhering literally to the language of Sec. 4380(1), supra, and restricting the defense of excusable homicide to an act done with *"usual and ordinary caution."* We think the contention is correct, in view of the provisions of the two sections next following, Sec's 4381 and 4382. Of these, Sec. 4381 declares the jury shall return a verdict of not guilty

---

[5]Italics in quotations hereafter are ours unless otherwise shown.

where it appears the homicide was excusable "by any statute or the *common* law." And Sec. 4382, on manslaughter, imposes no guilt for an unintentional, negligent killing unless the negligence be *culpable*. That section reads as follows: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."

As will be noted, this Sec. 4382 excludes killings "herein" declared to be excusable homicide, thus evidently referring to said Secs. 4380 and 4381 in the same Article, dealing with excusable homicide. But the necessary converse implication of Sec. 4380 is that a homicide is *not* excusable if the accused *failed* to use usual and ordinary caution, which would only be *simple* negligence; whereas the manslaughter statute declares the negligence must be *culpable*. And Sec. 4381 directs an acquittal if the homicide was excusable either under a statute *or* the common law. It is obvious that if the conduct of the accused must reach the higher level of culpable negligence, there is nothing to be excused (criminally) where he was guilty only of simple negligence. What was the degree of care required by the common law? And can these three statutes be harmonized?

Originally, this state followed the common law rule of excusability. R. S. 1825, sec. 5, p. 282. Of the statutes here involved Sec's 4380 and 4381 have been in our criminal code from its beginning. R. S. 1835, secs. 4, 5, p. 168. Three sections in the same code, secs. 7, 14 and 20, covered homicide by the act, procurement or culpable negligence of the accused. They were repealed and the present Sec. 4382 substituted therefor by Laws 1919, p. 256. But so far as we have been able to find, this court has never before been called upon to construe the three statutes together as bearing on the question of accidental killing by negligence. Some cases[6] have said instructions on excusable homicide ought to include the limitations or exceptions imposed by Sec. 4380, and that of course is true. But those cases were concerned only with the second clause of the statute bearing on killings in heat of passion or sudden combat. The question here is, what are the limitations of the first clause with respect to negligence.

The reason behind the requirement in Sec. 4380(1) that the collateral act must have been lawful and done by lawful means, is plain. Under the common law, speaking generally, if a homicide was committed in the doing of some other causative unlawful act then the homicide itself would be a crime, and the absence of homicidal intent and the defense of accident would be unavailing. An unlawful act, as we understand, would comprehend any "criminal offense" as now defined by Sec. 4867. On the other hand, if the collateral act

[6]State v. Farrell, 320 Mo. 319, 326(II), 6 S. W. (2d) 857, 860; State v. Ryland, 324 Mo. 714, 720, 25 S. W. (2d) 109, 112; State v. Frazier, 339 Mo. 966, 978(10), 98 S. W. (2d) 707, 714.

was lawful and unintentional, there would be no criminal responsibility unless the act was negligently done.[7] That, evidently, is the element which Sec. 4380(1) attempts to supply in requiring that the collateral act shall have been done "with usual and ordinary caution."

But the authorities are in conflict as to the *degree* of negligence that will make the collateral act (otherwise lawful) a crime. It is said that in measuring it, the cases range all the way from simple negligence to gross, culpable or wanton negligence, or such as would foreseeably endanger the safety or lives of others and betoken indifference to those consequences.[8] The overwhelming weight of authority is, however, that the negligence must be of the latter sort, and not merely such as would create a civil liability.[9] And that is the obvious intent of Sec. 4382 in calling it "culpable." The opinion is expressed by the annotator in 90 Am. St. Rep., pp. 571-2, that under the common law, also, where homicidal criminality is predicated on a lawful act negligently done, the negligence "must be aggravated, culpable, or gross." We think that is undoubtedly true.

Thus Blackstone states,[10] that where a person does an act resulting in homicide, which is lawful in itself, but in an unlawful manner and without *due* caution and circumspection, it may be either misadventure, manslaughter or murder according to the circumstances under which the original act was done. Then he uses the familiar example of a workman flinging a timber from a building into the street, saying if it were an unfrequented street in a small village and the workman had called out a warning, it would be misadventure; if on a frequented street in a populous town it would be manslaughter; and if on a street where he knew people were passing and he gave no warning, it would be murder. And 1 East, P. C. sec. 40, p. 265, says: "Death also happens from some unexpected occurrence in the course of human affairs. And herein the degree of impropriety or negligence attending the act is to be noted, in order to distinguish it from mere accidental death. The cases which occur on this head turn on the question, whether due caution has been used or not. And in general it may be

---

[7] 1 Warren on Homicide (Perm. Ed.), sec. 74, p. 320, sec. 164, p. 822; 1 Michie on Homicide, sec. 18(1), p. 112, sec. 125, p. 447; 13 R. C. L., sec. 149, p. 846, sec. 161, p. 858; 26 Am. Jur., sec. 192, p. 284, sec. 220, p. 305; 29 C. J., secs. 70, 71, pp. 1097-8, sec. 134, p. 1148; 30 C. J., sec. 269, p. 87; State v. Glover, 330 Mo. 709, 718(3), 50 S. W. (2d) 1049, 1052, 87 A. L. R. 400; State v. Robinett (Mo., Div. 2), 279 S. W. 696, 700(VI).

[8] 1 Warren on Homicide (Perm. Ed.), sec. 121, p. 545; 1 Michie on Homicide, sec. 74, p. 259.

[9] 10 Words & Phrases (Perm. Ed.), "culpable," p. 643; 19 id., "Homicide by Misadventure," p. 636; 23 id., "Killing by Misadventure," p. 546; 26 Am. Jur., sec. 210, p. 299; 29 C. J., sec. 141, p. 1154; 99 A. L. R., p. 829, note E; 23 id., p. 1554; 5 id., p. 603.

[10] 4 Blackstone's Commentaries (4 Lewis' Ed.), *p. 192, p. 1589; See also cases cited in State v. Studebaker, 334 Mo. 471, 480, 66 S. W. (2d) 877, 881(1).

observed, that the degree of caution requisite to bring the case within the limits of misadventure must be proportioned to the probability of danger attending the act *immediately conducive* to the death.''

In the light of these authorities we must conclude the words ''with usual and ordinary caution'' in Sec. 4380(1) do not refer to the doing of the collateral act in the abstract, but to the doing thereof in particular circumstances whereby human life would be so endangered that a failure to use proper care would evince a reckless disregard of life. Proper care would be such caution as a reasonably prudent man would usually and ordinarily exercise in *those* circumstances; and a failure to use it would be culpable. With possibly two exceptions[11] our decisions have consistently followed that rule.[12] And jury ▮ instructions have often so defined culpability in manslaughter prosecutions.

But beginning with the Millin case, just cited in note 12, all our opinions have held that such instructions are erroneous when they define culpable negligence merely as a failure to do something a reasonably prudent man would have done, or the doing of something such a man would not have done, even though the instruction adds the requirement that the act must have *directly endangered human life or safety*. They must include the element that the act was incompatible with a proper *regard* for human life and indicated a reckless *dis*regard thereof. In other words, the instruction must apply to the *mental* attitude of the accused. It therefore necessarily follows that instruction S 7 in this case was erroneous in restricting— without explanation—the defense of excusable homicide to situations where the accused had acted with usual and ordinary caution.

With reference to appellant's conflicting instruction D 11. In substance it defined accident or misfortune as an unusual, unexpected event happening without any unlawful intent or design on the part of the accused to produce the result which followed (death). Then it went on to say that if the appellant killed the infant in that manner without any intent to kill, the homicide was excusable. The foregoing may have been a sufficient definition of the ordinary non-technical meaning of accident. 1 Words & Phrases (Perm. Ed.), p. 315 et seq. In fact the Farrell case cited in marginal note 6 declared an accidental killing is ''a killing without an intention

---

[11]State v. Mull, 318 Mo. 647, 654, 300 S. W. 511, 513; State v. Lockwood, 119 Mo. 463, 466-7, 24 S. W. 1015, 1016.

[12]State v. Emery, 78 Mo. 77, 47 Am. St. Rep. 92; State v. Morrison, 104 Mo. 638, 642, 16 S. W. 492, 493; State v. Millin, 318 Mo. 553, 558, 300 S. W. 694, 697; State v. Baublits, 324 Mo. 1199, 1211, 27 S. W. (2d) 16, 21; State v. Studebaker, supra, 334 Mo. l. c. 476(I), 66 S. W. (2d) l. c. 878(I); State v. Sawyers, 336 Mo. 644, 647(1), 80 S. W. (2d) 164, 166; State v. Carter, 342 Mo. 439, 441, 116 S. W. (2d) 21, 22.

to kill.'' And in a number of cases[13] jury instructions have said that excusable homicide means ''the accidental killing of another.''

But under the necessary implications of Sec. 4380(1) an accidental killing is *not* excusable if the homicide was committed in the perpetration of an unlawful act or through culpable negligence. The State did not submit the instant case on the theory of culpable negligence (but only on an intentional assault without malice which resulted fatally) ; so appellant's instruction D 11 did not err in likewise omitting the culpable negligence limitation. But the instruction was erroneous in excusing appellant if, merely, she had no intent to *kill*, because, if she had the intent to do *bodily harm*, though not to kill, in smothering the infant it was an assault and battery,[14] (not in heat of passion or sudden combat) and therefore a criminal offense which deprived her of the statutory defense of excusable homicide, and made the homicide at least manslaughter. Whether there was an intent to do bodily harm was a question for the jury, and that issue should have been covered in the instruction. This instruction D 11 was unduly favorable to appellant and she cannot, therefore, complain on the ground alone that there was conflict between it and instruction S 7.

But since the latter instruction was erroneous, the remaining question is whether the error was prejudicial to appellant. In this connection it should be remembered that said instruction S 7 in defining ''excusable homicide'' qualified the definition by adding the phrase, ''as used in these instructions.'' The only other instruction that did use the term was the instruction on manslaughter: In so doing it said ''excusable homicide (as elsewhere defined in these instructions).'' Thus there was cross-reference to the term in those two instructions. The other main instruction was on second degree murder. It was wholly silent on the defense of excusable homicide. For these reasons the State's view is that instruction S 7 defined excusable homicide solely for the purposes of the manslaughter instruction, and transmitted the error in the definition to the latter instruction alone.

It is then suggested that since appellant was not convicted of manslaughter the error was harmless. But if the foregoing be true, the instruction S 7 was erroneous not only in its definition but also in failing ▮ to extend the defense of excusable homicide to second degree murder. And it was, at least, an erroneous instruction on a lower degree of homicide than that of which appellant was convicted.

---

[13]State v. Farrell, 320 Mo. 319, 326, 6 S. W. (2d) 857, 859; State v. Bradford, 324 Mo. 695, 702, 24 S. W. (2d) 993, 995; State v. Frazier, supra, 339 Mo. 1. c. 979, 98 S. W. (2d) 1. c. 714; State v. Gadwood, 342 Mo. 466, 494, 116 S. W. (2d) 42, 58.

[14]4 Am. Jur., sec. 6, p. 129; 5 C. J., secs. 173, 174, pp. 712, 715; 6 C. J. S., sec. 57, p. 913; 4 Words & Phrases (Perm. Ed.), p. 359; State v. Sears, 86 Mo. 169, 174; 29 C. J., sec. 137, p. 1150; 26 Am. Jur., sec. 195, p. 287.

A further suggestion is that since the jury convicted appellant of second degree murder, they necessarily must have found her guilty of an intentional, premeditated and malicious killing, as required by the instruction on that degree of the crime; and therefore must have rejected her evidence that the killing was unexpected and undesigned; in consequence of which the error in the instruction was harmless.

It has recently been held that where the evidence furnishes a basis for an excusable homicide instruction, the trial court must give it whether requested or not, as a part of the law of the case, under Sec. 4070(4). State v. Crowley, 345 Mo. 1177, 1182(I), 139 S. W. (2d) 473, 475. In that case, as here, the defendant was convicted of second degree murder and there was evidence to support an instruction on excusable homicide by accident under Sec. 4380(1). But no such instruction was given and the cause was reversed and remanded for that reason. We find further, on an examination of the original record in the Crowley case, that an instruction on manslaughter also was given there. So that case and this one are alike except that no excusable homicide instruction was given in the Crowley case whereas here one was given that was erroneous. But Sec. 4070(4) in requiring an instruction on all such essential issues obviously means a good instruction—otherwise the requirement would be useless or worse than useless.

So we are unable to agree the error in instruction S 7 was harmless. Neither can we accept that view on the theory that the conviction of second degree murder shows the jury did not believe appellant's controverting testimony upon which a proper excusable homicide instruction might have been based. She was entitled to have the jury weigh her testimony under a good instruction. We cannot say judicially that their verdict would not have been different if they had been properly instructed, even though the conclusion they reached was inconsistent with the facts hypothesized in instruction S 7. The jury may have been repelled from that instruction because it erroneously required them to find she had used ''usual and ordinary caution,'' when they thought she had not, although they may have believed her act was lawful and that she had no unlawful intent. As a matter of fact, the instruction was erroneous in submitting to the jury the *legal* questions whether her act was ''lawful'' and her intent ''unlawful.''

But the broader ground for rejecting the State's contention is that in Missouri appellate courts do not reason deductively from the jury's verdict back to their actual intention, where they *may* have been adversely influenced by an erroneous instruction or by the lack of an instruction required by the statute. We are aware a contrary practice prevails in some states. 17 C. J. sec. 3705, p. 348; 24 C. J. S.

sec. 1922, pp. 1037-8. And there have been some such decisions here.[15] But we think the better reasoned cases are to the contrary.[16] So many decisions have held it error to fail to give instructions on degrees of the crime lower than that of which the accused was convicted, when the evidence warrants it, that we need only cite on that point, 15 West's Mo. Dig. "Homicide," sec. 309(4), p. 221. And we can see no reason why the same rule should not apply to instructions given if they were prejudicially erroneous in form. Especially should this be true when, as here, the instruction was on a *defense* applicable to both second degree murder and manslaughter.

Furthermore, under Sec's 3952 (latter part), 4844 and 4845, if the accused be convicted of a degree of the offense lower than that with which he was charged, even though the greater weight of the evidence or all of it shows him guilty of the higher degree, the verdict will stand. State v. Reagan (Mo., Div. 2), 108 S. W. (2d) 391, 396(11). So here, notwithstanding the evidence may have preponderated in favor of the jury's verdict, yet appellant was entitled to the possible benefit of her own. The rule in this State, as we understand, is that substantial error in instructions on a material point will be deemed prejudicial unless the error was in the defendant's favor, or the instruction applied only to some ▇ higher degree of the crime or separate offense of which he was not convicted.

Because of the error in instruction S 7 the judgment is reversed and the cause remanded. All concur.

---

[15]State v. Dunn, 80 Mo. 681, 693; State v. Jackson, 167 Mo. 291, 297, 66 S. W. 938, 939; State v. Barker, 216 Mo. 532, 548(II), 115 S. W. 1102, 1106.

[16]State v. Barnett, 203 Mo. 640, 662, 102 S. W. 606, 612; State v. Edwards, 203 Mo. 528, 543, 102 S. W. 520, 525; State v. Little, 228 Mo. 273, 307(9), 128 S. W. 971, 979(10); State v. Buckner, 335 Mo. 229, 233, 72 S. W. (2d) 73, 75(6).