**STATE of Missouri, Respondent,**

**v.**

**Thelma Fern GRANT, Appellant.**

**No. 49735.**

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

R. B. Kirwan, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Robert D. Kingsland, Asst. Atty. Gen., Jefferson City, for respondent.

HOLLINGSWORTH, Judge.

On January 21, 1962, Homer Oral Taylor, a tavern operator, was fatally shot with a shotgun held in the hands of defendant, Thelma Fern Grant, in an apartment adjacent to or adjoining the tavern operated by Taylor, in Jackson County, Missouri, in which Taylor and defendant, not married to each other, then and had lived together more than two years. Defendant was charged by an information filed in the Circuit Court of Jackson County with murder in the first degree. When the case came on for trial, at which defendant and her counsel (who also represents her on this appeal) were present, counsel for the State, in open court, reduced the charge against defendant to murder in the second degree. Upon trial, at which defendant testified the shotgun was accidentally discharged, the jury returned a verdict finding her guilty of murder in the second degree and assessing her punishment at ten years imprisonment in the State Penitentiary. Her motion for new trial thereafter timely filed was overruled, due allocution was granted and the trial court adjudged her guilty and sentenced her to imprisonment in the Women's Reformatory at Tipton for a term of ten years in accordance with the verdict. Certain of the errors urged on appeal neces-

sitate a detailed statement of the evidence.

The evidence adduced in behalf of the State supports a finding of these facts: At 7:12 p. m. on the day of the shooting, defendant called the Grandview Police Department and talked with the Police Dispatcher. After identifying herself, she said, "I killed Homer, I mean it this time." He asked her where she was. She repeated the foregoing statement. He again asked for her address and she said, "You know where I am, come on down." He asked if she was in the apartment or in the tavern and she said she was in the apartment. He knew where it was and sent Police Officer Couch to answer the call, who went to the apartment occupied by Homer and defendant, knocked at the locked kitchen door and called to defendant, who admitted him into the kitchen. She wore a robe over a nightgown. Asked "what was the matter", defendant said she had "finally killed Homer." Asked where Homer's body was, she led Officer Couch through the living room, where she pointed to a shotgun lying on a divan. They then went through a narrow hall into the bedroom, where he saw Homer's body, covered with a blanket up to the base of his skull, lying upon a bed. He pulled the blanket covering Homer's body down below his shoulder. Homer was lying on his left side, his head resting upon his left arm, which was extended outward and flexed upward, resting on a pillow. The discharge from the shotgun had entered the right side of the base of his neck above the collarbone. There had been a heavy flow of blood from the wound across the neck and chest to the bed.

Examination of the shotgun showed it to be unloaded. It was a .16 gauge gun, so designed that when a shell was placed in the barrel the gun was automatically cocked and could be uncocked only by pulling the trigger or by use of a safety device forward of the trigger housing. Lying upon the floor nine feet from the point where the shotgun blast had entered Homer's neck, Officer Couch found a spent shotgun shell.

Defendant told Officer Couch at that time that she and Homer had an argument earlier in the evening during which Homer had pointed the gun at her; that thereafter she came around from the hallway into the bedroom and pointed the gun around the corner; that Homer said to her, "Are you going to kill me before I kill you?"; that she discharged the shotgun while standing about nine feet from where Homer's head lay on the pillow of the bed; and that she knew Homer always kept the shotgun loaded. About 20 minutes after Couch arrived at the scene, other officers arrived in answer to a radio call made by him from his police car after he had placed handcuffs on defendant.

Grandview Police Officer Sullivan was one of those who came to the scene in answer to Couch's call. He saw and talked with defendant as he and she sat at the kitchen table, during which time Couch was attending to the removal of Homer's body. Defendant told Sullivan she got the shotgun from behind the TV set in the southeast corner of the living room; that she stood in the hall between the living room and bedroom and pointed the gun at Homer. Homer looked up, saw the gun pointed at him and said, "Oh, my God, no"; and that she then shot him as she stood about nine feet from him. Sullivan did not notice that she had been drinking. She did not say to him that the gun was accidentally discharged. She made no written statement to him; he only took a few notes.

James Browning, a detective attached to the Jackson County Police Patrol, went to the Grandview police station at about ten o'clock that night, to which defendant had been taken. He took her to the headquarters of the Sheriff's Patrol. On the next morning, she made a statement to him which was transcribed on a typewriter by a girl stenographer in that office as Browning asked defendant questions and she answered them. Defendant read the thus transcribed statement and signed it. That statement, the voluntariness of which is not challenged,

was admitted in evidence. It states, in material substance, that defendant was born on December 31, 1926, and then proceeds:

"About noon Homer and I started drinking, this was January 21, 1962, and some man come over from the club and brought a fifth of whiskey. We went over to the club and started drinking some more. Homer and this man were gambling in the back room. I was sitting out in the front room and Homer got mad because some man spoke to me. There were several people in the club, this club is the Elks club next door to Homer's tavern. Homer grabbed me by the arm and we went home and he started hitting me and cussing me, I was drunk too and I went in and laid on the bed and I thought Homer would let me alone, first he came in and grabbed me out of bed and said no one else was going to have me. I never thought any more about it and he came in with that shotgun and he pointed the gun at me and I didn't think it was loaded so I told Homer to leave me alone. Homer gets that way when he is drinking and I got up off the bed and swished past him into the kitchen to fix him a sandwich and I thought he would go in and be quiet while I fixed it as he usually does and then he started screaming and calling me names and kept it up, I grabbed the gun off the divan and I was just going to do like he did and I swung the gun around the corner and it went off, I dropped the gun and looked around and picked up the empty shell or started to and I was so scared I went to the phone and called the police. I was afraid to look at Homer because I hadn't known the gun was loaded and it shocked me so. I went to the front door and stayed there until the police arrived.

"Q. Is this all you can remember? A. Yes.

\* \* \* \*

"Q. You two fought before? A. Yes, we always fought.

\* \* \* \*

"Q. Are you pretty good with a shotgun? A. Yes, at trap shooting and I didn't aim the gun at Homer, I just swung the gun around and it went off. I guess I automatically had my finger on the trigger, when I picked the gun up. In none of our arguments had we ever talked or used a gun to threaten each other."

On that day, Officer Browning also took the coverings from the bed upon which Homer's body was found and a number of loaded shotgun shells found in the apartment and tavern, all of which were of the same brand, gauge and shot size as the spent shell found on the apartment floor. The blanket taken from that bed showed the hole and dark spots made on it by the shotgun blast. The hole, dark spots and blood were at the top part of it, where it covered the right base of his neck as he lay with his head on the pillow when he was shot. Browning made seven test shots by the use of the shotgun shells taken from the premises and fired from the shotgun with which Homer had been shot. These test shots were fired into cloth from recorded distances, ranging from a distance of nine feet to two inches from the gun muzzle to the point where the shot entered the cloth. The shot pattern found on the blanket and the test patterns made on the cloth were produced in court. A duly qualified expert attached to the Kansas City, Missouri, Police Department, Supervisor of Crime Detection Laboratory, testified, after examination of the blanket and the test shot patterns, that in his opinion the shotgun blast which killed Homer was fired when the muzzle of the shotgun was two inches from Homer's neck.

The evidence adduced in behalf of defendant consisted only of her testimony. Her version of the facts was: Shortly after noon on the day of the shooting, a male friend of Homer, whose name she could not

remember, came to the apartment. She, Homer and Homer's friend each had two drinks. She and they then went to a nearby club. Homer and his friend gambled in the back room while she sat in the front room and had two more drinks. A man, whom she knew but whose name she could not recall, there spoke to her. Homer came from the back room, took her by the arm and they went home. Homer there started pushing her around a little; neither he nor she was really mad. Homer kept "lipping off", telling her that the man was flirting with her. She undressed, intending to watch television. Homer came into the room with this gun. She was lying on the bed. He said, "If I can't have you, nobody else will", but said it "like he was cutting up", "not exactly" mad. She got up from the bed to go to the kitchen to fix him some food. As she went into the living room, she pushed the gun over and told him to "lay down" and he did. Usually when he "lipped off" she would throw water in his face, but when she saw the gun, as she went toward the kitchen, she picked it up, pointed it toward the bed—did not know how far away from Homer she was—and it went off. She looked down at the gun, threw it down and the shell fell out. She still couldn't believe it went off, started to pick the shell up from the floor, was afraid to touch it, and called the police. She did not know what caused the gun to go off, but did know that she had hit her elbow on something, her arm has been sore ever since. Homer did not say, "Oh, my God, don't kill me"; neither did she say to the policeman, "I shot Homer like I said I was going to." She did not think she made any statement to Officer Couch that she intentionally shot Homer. She did not intend to kill him. "That is the silliest thing I have ever done in my life." She guessed she must have had her finger on the trigger and did not believe the gun was loaded, did not have the gun to her shoulder; and she was not drunk.

■ We now turn to what counsel for defendant designates as "Appellant's Statement, Abstract of the Record, Brief and Argument." It consists of a "Statement", which summarizes the proceedings in this case from the filing of the information to and including the filing of an approved transcript; a "Resume of Testimony", consisting of slightly more than one page; all of the eleven instructions under which the case was submitted to the jury; a verbatim copy of the motion for new trial; and then sets forth under the heading "Suggestions", consisting of approximately four pages, what we will treat as defendant's "Brief". There, in argumentative form, is what amounts to an assertion that the trial court prejudicially erred in giving Instructions Nos. 2 and 4, which submitted a finding of defendant's guilt of manslaughter in the killing of Homer under such circumstances as not to constitute excusable or justifiable homicide. Interwoven with that assertion of error, we also find the reasoning upon which the error asserted is predicated. Consequently, we will consider the errors thus "assigned". (We note, however, that these "Suggestions" make no mention of or reference to any of the subject matter of the other assignments of error alleged in the motion for new trial. They, therefore, are deemed waived or abandoned under the provisions of S.Ct. Cr.Rule 28.02, V.A.M.R., except, of course, that as required by said rule, we will, if it becomes necessary, review the portions of the record in said rule specified as requiring no assignment of error as a prerequisite to their review.)

Instruction No. 2, to the extent here material, reads:

" 'Manslaughter' is the killing of a human being not herein declared to be murder or excusable or justifiable homicide, and the Court instructs the jury that if you believe and find from the evidence in this case, beyond a reasonable doubt, that * * * the defendant * * * wilfully and feloniously did make an assault upon one Homer Oral Taylor with a dangerous and deadly weapon, to-wit: a 16 gauge shotgun loaded with metal pellets and shot and killed the said Homer Oral Taylor,

without malice and without premeditation, as these terms are herein before explained and under such circumstances that it is not excusable or justifiable homicide, then you will find the defendant guilty of Manslaughter and so find in your verdict.

"And, unless you find the facts to be as above stated, you are instructed to acquit the defendant of Manslaughter.

* * * *

" 'Justifiable Homicide' is the killing of another in the lawful defense of one's person.

■ ■ " 'Excusable Homicide' is the accidental killing of another." [1]

Instruction No. 3 reads:

"The Court instructs the jury that homicide shall be deemed excusable when committed by accident or misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution and without unlawful intent.

"The term 'accident' means an event that takes place without one's foresight or expectation, an undesigned, sudden and unexpected event; an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty."

■ In the "Suggestions" filed in behalf of defendant, our attention is first directed to the fact that Instruction No. 2 authorizes acquittal of defendant of manslaughter only if the killing was (1) justifiable (not here contended) or (2) *excusable, that is, accidental.* Our attention is next directed to (but no complaint is made of) the fact that

Instruction No. 2 did not in words hypothesize any finding of defendant's guilt of homicide by an *act of culpable negligence,* which, as seen in footnote, also constitutes homicide when supported by competent evidence. It seems clear, however, that the definition of "excusable homicide", as set forth in Instruction No. 3, sufficiently embodied accidental killing of another such as would constitute excusable homicide, when it therein declared that "homicide shall be deemed excusable when committed by accident or misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution and without unlawful intent."

The "Suggestions" next direct our attention to a portion of the written statement made by defendant, as follows: "I grabbed the gun off the divan and I was just going to do like he did and I swung the gun around the corner and it went off." The contention is then made, as we understand it, that when the State introduced in evidence defendant's written statement, which contained the portion stating in effect that defendant did not intentionally fire the gun, the State thereby "disproved" any wilful or intentional killing of Homer by defendant; that the State was bound by that evidence; and that, perforce thereof, the State could not be permitted to ignore its own theory, which, it is contended, Instruction No. 2 did by submitting a finding that defendant "wilfully and feloniously did make an assault upon [Homer] with a dangerous and deadly weapon", etc.; and that the sole ground upon which defendant's guilt of manslaughter could be lawfully predicated was an act of culpable negligence. (Although defendant does not make the point, it would also follow that if the State is bound by the foregoing portion of defendant's written state-

1. Manslaughter is defined, § 559.070 RSMo 1959, V.A.M.S., as "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, * * *."
It should be here noted that the accidental killing of another does not con-

stitute excusable homicide within the meaning of § 559.050 (defining excusable homicide) if perpetrated in the commission of an unlawful or culpably negligent act. State v. Aitkens, 352 Mo. 746, 179 S.W.2d 84, 93 [19–22]; State v. Hinojosa, Mo., 242 S.W.2d 1, 10 [21].

ment, then the verdict and judgment finding her guilty of murder in the second degree could not stand.)

■ The contention that the State became bound by the above quoted portion of the written statement made by defendant when it introduced the entire statement in evidence is without merit. The statement was introduced because of the admissions made therein as to when, where and how and under what circumstances Homer was killed. When the statement was so introduced, defendant was, of course, entitled to have any admission therein made considered in context with the remainder of her statement, so that the jury could consider each and every portion thereof in the light of the whole; and it was the province of the jury to believe or disbelieve the whole or any part of it. But, inasmuch as the State adduced other evidence (by way of extrajudicial oral admissions made by defendant to the police officers on the night of the shooting) sufficient to submit the issue of defendant's guilt of either murder in the second degree or manslaughter, as the jury might find the facts to warrant, the State was not bound by the portions thereof favorable to defendant. Kiburz v. Loc-Wood Boat & Motors, Inc., Mo., 356 S.W.2d 882, 887 [6].

■ Defendant's final "assignment" is that Instruction No. 4 was prejudicially erroneous. That instruction (the allegedly erroneous portions of which we italicize) was:

"The Court instructs the jury that if you believe and find from the evidence in this case, *beyond a reasonable doubt,* that Homer Oral Taylor, came to his death by accident, *and that there is a reasonable doubt that he came to his death by accident,* it is the duty of the jury to give the defendant the benefit of such doubt and find her not guilty.

"The burden of proof is not upon the defendant to prove that Homer Oral Taylor came to his death by accident, but the burden of proof is upon the State to show by credible evidence beyond a reasonable doubt, that said shooting was intentionally done by the defendant, and that Homer Oral Taylor did not come to his death by accident."

Numerous readings of the first paragraph of that instruction leave no doubt that it placed upon the jury the duty of reaching an impossible finding of fact as a prerequisite to the acquittal of defendant on grounds that she accidentally shot him to death. Under the evidence in this case, it is hardly conceivable that the jury would have entertained any reasonable doubt of defendant's guilt of either murder in the second degree or manslaughter, as it should find the evidence to warrant, until defendant had testified that the shotgun was accidentally discharged as she turned to point it toward Homer to frighten him. If the jury read the first paragraph of Instruction 4, as was its sworn duty, the first clause thereof required it to find beyond a reasonable doubt that she had truthfully testified in that respect. When, however, the jury read the conjunctive "and" in connection with the second clause, "that there is a reasonable doubt that [Homer] came to his death by accident", it was confronted with an impossibility, viz.: finding beyond a reasonable doubt that the shooting was accidental and at the same time finding that there was a reasonable doubt that it was accidental. It was, therefore, only when the jury believed these self-destructive findings that it was further directed in the first paragraph of the instruction to acquit defendant. Did the second (and correctly worded) paragraph serve to erase the error of the first? Or, rather did it, when read in conjunction with the first paragraph, the more tend to confound the jury? The two paragraphs cannot be reconciled.

No person other than defendant *knows* whether she intentionally or unintentionally shot Homer. It is possible that, after hearing her testimony in that regard and considering it in the light of all of the other facts

**16**

and circumstances shown in evidence, the jury may have entertained a reasonable doubt that she intentionally shot Homer. It is here noted that the court also gave the jury the many times approved instruction, in substance, that unless the jury believed beyond a reasonable doubt the facts hypothesized in the instructions submitting the issue of defendant's guilt of murder in the second degree or manslaughter, it should acquit defendant. But, when the court saw fit to give the jury a special instruction as to the proof required to authorize acquittal of defendant, on grounds she accidentally shot Homer, that instruction should have advised the jury unequivocally that, if it did have such a doubt, it should acquit defendant. The jury was not so advised. We cannot with conviction say that the instruction, read in its entirety, was not prejudicial.

The judgment is reversed and the cause remanded.

All concur.